SUBJECT TO FURTHER EDITING

OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.


Savoie, Admr., Appellant and Cross-Appellee, v. Grange Mutual
Insurance Company, Appellee and Cross-Appellant; Motorists
Mutual Insurance Company, Appellee.
[Cite as Savoie v. Grange Mut. Ins. Co. (1993),    Ohio St.3d
.]
Insurance -- Underinsured motorist coverage -- Wrongful death
     -- Each person entitled to recover under R.C. 2125.02 has
     separate claim subject to any per accident limit --
     Insurers may contractually preclude stacking of
     uninsured/underinsured limits for separate vehicles, when
     -- Underinsurance claim must be paid, when -- Each person
     who is covered by a uninsured/underinsured policy has a
     separate claim subject to a per person policy limit.
1. Each person who is presumed to have been damaged as a result
     of a wrongful death claim may, to the extent of his or her
     damages, collect from the tortfeasor's liability policy up
     to its per person limits subject to any per accident
     limit.  Liability policy provisions which purport to
     consolidate wrongful death damages suffered by individuals
     into one "each person" policy limit are unenforceable.
     (State Farm Auto. Ins. v. Rose [1991], 61 Ohio St. 3d 528,
     575 N.E.2d 459, and paragraphs one and two of the syllabus
     of Burris v. Grange Mut. Cos. [1989], 46 Ohio St.3d 84,
     545 N.E.2d 83, overruled;  Wood v. Shepard [1988], 38 Ohio
     St.3d 86, 526 N.E.2d 1089, applied and followed.)
2. Insurers may contractually preclude intrafamily stacking --
     the stacking of uninsured/underinsured limits of policies
     and coverages purchased by family members living in the
     same household.  Insurers may not contractually preclude
     interfamily stacking -- the aggregation of
     uninsured/underinsured limits of policies purchased by two
     or more people who are not members of the same household.
     (Hower v. Motorists Mut. Ins. Co. [1992], 65 Ohio St.3d

442, 605 N.E.2d 15, overruled;  Karabin v. State Auto. Mut. Ins. Co. [1984], 10 Ohio St. 3d 163, 10 OBR 497, 462 N.E.2d 403, and paragraph one of the syllabus of Dues v. Hodge [1988], 36 Ohio St. 3d 46, 521 N.E.2d 789, limited.)

3. An underinsurance claim must be paid when the individual covered by an uninsured/underinsured policy suffers damages that exceed those monies available to be paid by the tortfeasor's liability carriers. (Hill v. Allstate Ins. Co. [1990], 50 Ohio St. 3d 243, 553 N.E.2d 658, overruled.)

4. Each person, who is covered by an uninsured/underinsured policy and who is presumed to be damaged pursuant to R.C. 2125.01, has a separate claim subject to a separate per person policy limit.  (Wood v. Shepard [1988], 38 Ohio St.3d 86, 526 N.E.2d 142, applied; Paragraph two of the syllabus of Dues v. Hodge, supra, limited.)

(No. 92-952 -- Submitted March 17, 1983 -- Decided October 1, 1993.)

Appeal and Cross-Appeal from the Court of Appeals for Holmes County, No. CA-450.

The facts in this case have been stipulated by all the parties.  On September 28, 1989, Christina L. Savoie was killed in an automobile accident caused by Gary F. Miller, who was driving the automobile in which Christina was a passenger. The automobile operated by Gary Miller, a 1982 Honda Accord, was owned by Earl R. Miller.  Earl Miller had given his son, Gary, permission to operate the automobile.  David L. Byland was also injured in this accident when the car driven by Gary Miller crashed into his truck.  The collision, the instantaneous death of Christina Savoie, and the injuries to David Byland were all proximately caused by the negligence of Gary Miller.

The Honda operated by Gary Miller and owned by Earl Miller was covered by a Grange Mutual Casualty Company automobile insurance policy. The limits for liability for this policy were $100,000 per person and $300,000 per accident.

There were also in effect two uninsured/underinsured insurance policies from Motorists Mutual Insurance Company. Each policy provided coverage in the amount of $100,000 per person and $300,000 per accident.

Under the provisions of the first policy with Motorists, Policy No. 4246-06-200902-07A ("Motorists Policy I"), Donald Savoie, the decedent's father was the named insured.  Mary Savoie, the decedent's mother, was a listed driver on the policy.

Under the second policy with Motorists, No. 4246-04-200901-01D ("Motorists Policy II"), Donald Savoie was the named insured with Mary Savoie, Christina Savoie and Debbie Savoie, the sister of the decedent, being listed as drivers.

Mary Savoie, the duly appointed administrator of her daughter Christina's estate, filed a wrongful death action against Gary Miller and Earl Miller for all persons sustaining loss by the death of Christina.  She also sought recovery for the entire class of injured persons against Motorists' underinsured coverage.  David Byland also made a claim against Gary and Earl Miller through Grange for the injuries he incurred as a result of the automobile accident.  Mary Savoie asserts Grange paid David Byland $75,000 in full and final

settlement of his claim.

On June 26, 1990, Mary Savoie, in her capacity as administrator, filed a complaint for declaratory judgment in the Holmes County Court of Common Pleas. In this complaint, Mary, as administrator, asked that the court determine the various rights and obligations between herself, as the decedent's mother, Donald Savoie, as the decedent's father, Debbie Savoie, as the decedent's sister, Grange, as the tortfeasor's liability insurer, and Motorists, as the provider of underinsured coverage to Mary Savoie, Donald Savoie and Debbie Savoie (collectively, "the Savoies").

In its initial findings of fact and conclusions of law, the trial court determined that the Savoies were entitled to collect up to $300,000 from the tortfeasor's insurer, Grange. The trial court also found that the limits of the two Motorists uninsured/underinsured policies in which the Savoies were named insureds could not be "stacked" or combined. Finally, the trial court found that the Savoies were not permitted to collect upon their underinsurance coverage because their own policy limits were identical to the limits of the tortfeasor's liability policy.

On August 22, 1991, the court filed amended findings of fact and conclusions of law which came to the same ultimate conclusions as the first entry.

On October 30, 1991, the trial court filed second amended findings of fact and conclusions of law. The court, after citing State Farm Auto. Ins. Co. v. Rose (1991), 61 Ohio St. 3d 528, 575 N.E.2d 459, concluded the Savoie claimants collectively were limited to the "$100,000 each person" limit in the tortfeasor's insurance policy with Grange. The court reiterated its holding regarding the uninsured/underinsured policy with Motorists.

Mary Savoie, as administrator, appealed the trial court's decision. On April 17, 1992, the Court of Appeals for Holmes County determined that the trial court had erred when it held that the Savoies were collectively restricted to the "$100,000 each person" language in the tortfeasor's liability policy with Grange. Instead, the court of Appeals held that the Savoie claimants were collectively subject to the "$300,000 each accident" limit. The court of appeals affirmed the trial court's treatment of the Savoies' underinsurance policies.

The cause is before this court pursuant to the allowance of a motion and cross-motion to certify the record.

Frase, Weir, Baker & McCullough and Robert E. Weir; and Norman S. Davitt, for appellant and cross-appellee.

Reynolds & Reynolds and Craig R. Reynolds for appellee and cross-appellant.

Baker, Meekison & Dublikar, Gregory A. Beck, Carol A. Costa and Rosemarie A. Hall, for appellee Motorists Mutual Insurance Company.

Scanlon & Henretta Co., L.P.A., J. Thomas Henretta and Ann Marie O'Brien, for amicus Ohio Academy of Trial Lawyers.

Pfeifer, J.    Mary Savoie, as administrator, raises three questions of automobile insurance law, which have been the subject of continued redefinition and controversy within

this court:  What are the effects of "per person" limits in liability policies on multiple wrongful death claimants?  When is it permissible to combine or stack uninsured/underinsured motorists policies?  To what extent do underinsurance policies provide coverage to their own named insureds facing inadequate compensation from a tortfeasor's liability insurer?

I

Mary Savoie, administrator, contends that the decedents' parents and sister are each entitled to recover up to $100,000 under the tortfeasor's "per person" limitations in his liability policy and are collectively subject to the $300,000 per occurrence limit.  Grange argues that the multiple claimants must be merged under the wrongful death statute into a single cause of action brought by the administrator and are, therefore, confined to a single combined "per person" recovery limit.

In a refreshing moment of candor, Motorists' attorney in oral argument urged this court to:

"***use the statute in a wrongful death [claim] to get to a position where all the insurance companies know that when there is a death claim, no matter what the policy says, we have in fact a full policy exposed. That would reduce so much litigation. It would reduce so much complexity. It would allow us in the insurance industry to at least focus on what the claim is and then we would know.  That's the posture that Motorists Mutual would like to present to the court in this case, and if the court takes that posture, then, certainly Grange Mutual owes $225,000."

The liability policy issued by Grange provides:

"The limit of liability shown in the Declarations for 'each person' for Bodily Injury Liability is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of bodily injury sustained by any one person in any one auto accident.  Subject to this limit for 'each person', the limit of liability shown in the Declarations for 'each accident' for Bodily Injury Liability is our maximum limit of liability for all damages for bodily injury resulting from any one accident. ***This is the most we will pay regardless of the number of

"1. Insureds;
"2. Claims made;
"3. Vehicles or premiums shown in the Declarations; or
"4. Vehicles involved in the accident."

In an attempt to narrowly interpret its own insurance policy provision, Grange ignores the elevated status of wrongful death claims in Ohio.

To manage the presentment of wrongful death claims the General Assembly enacted  R.C. 2125.02, which charges the estate's administrator with the responsibility of consolidating the wrongful death damages of all claimants into one action. The statute also provides that "the surviving spouse, the children, and the parents of the decedent" all "are rebuttably presumed to have suffered damages" resulting from wrongful death. R.C. 2125.02(A)(1).

Previously, in Wood v. Shepard (1988), 38 Ohio St. 3d 86, 526 N.E.2d 1089, this court held that an underinsured motorists policy could not consolidate all the wrongful death claims of

those presumed to have suffered damages under R.C. 2125.02 and subject them to a single per person limit in that policy .

The General Assembly and this court have expressed the view that damages for wrongful death claims should not be limited.  Even the Ohio Constitution in its Bill of Rights provides:

"The amount of damages recoverable by civil action in the courts for death caused by the wrongful act, neglect, or default of another, shall not be limited by law."  Section 19a, Article I, Constitution of Ohio.

Consistent with this view, each person who is presumed to have been damaged as a result of a wrongful death, to the extent of his or her damages, may collect from the tortfeasor's liability policy up to its per person limits subject to any per accident limit.  Liability policy provisions which purport to consolidate wrongful death damages suffered by individuals are unenforceable because they directly violate the policy expressed by the General Assembly and this court.

Because this court in State Farm Auto. Ins. v. Rose (1991), 61 Ohio St. 3d 528, 575 N.E.2d 459, and in paragraphs one and two of the syllabus of Burris v Grange Mut. Cos. (1989), 46 Ohio St.3d 84, 545 N.E.2d 83, has misinterpreted the legislative status of wrongful death claims in Ohio, these cases are overruled accordingly.

By applying our analysis to the facts in the case before us, we find the mother, father and the sister of the decedent are individually entitled to recover, to the extent they prove damages, a maximum of $100,000 each up to $225,000 which is the balance of the Grange liability policy limits available to the Savoie claimants.  On this issue, the holding of the court of appeals is affirmed.

                                II

The Savoies ask this court to declare that antistacking clauses contained in two separate uninsured/underinsurance policies are both unenforceable.  Motorists, the insurer under both of these policies, urges that the clauses be enforced. The antistacking provisions in both policies are identical. They provide:

"OTHER INSURANCE

"If there is other applicable similar insurance available under more than one policy or provision of coverage

"1. Any recovery for damages for bodily injury  sustained by an insured may equal but not exceed the higher of the applicable limit for any one vehicle under this insurance or any other insurance

"2. Any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible insurance.

"3. We will pay only our share of the loss.  Our share is the proportion that our limit of liability bears to the total of all applicable limits."

The Motorists policy also attempts to prohibit the stacking of multiple uninsured/underinsured policy limits which have been purchased by the same family.

"Two or More Auto Policies

"If this policy and any other auto insurance policy issued to you by us apply to the same accident, the maximum limit of our liability under all the policies shall not exceed the

highest applicable limit of liability under any one policy."

This antistacking language in the policies passes the "unambiguous," "clear" and "conspicuous" test as delineated in Dues v. Hodge (1988), 36 Ohio St. 3d 46, 521 N.E.2d 789, paragraph one of the syllabus.

However, we no longer support the analysis of antistacking language used in Dues v. Hodge. Our discomfort is rooted in a concern that liability insurers are collecting multiple premiums for multiple policies, while limiting recovery by antistacking language -- the import of which is not known or understood by the insured consumer until tragedy strikes.

Dues v. Hodge and its progeny broadly contravened the line of cases which was developing prior to the enactment of R.C. 3937.18(E), now 3937.18(G), in 1980. In Curran v. State Auto. Mut. Ins. Co. (1971), 25 Ohio St.2d 33, 54 O.O.2d 166, 266 N.E.2d 566, this court in an unanimous decision announced that antistacking provisions were "repugnant" to the purpose of the uninsured/underinsured motorists statute when they are used by an insurer to deny coverage to an insured because other uninsured coverage is available to the insured under a different policy from a different insurer. In Grange Mut. Cas. Co. v. Volkmann (1978), 54 Ohio St. 2d 58, 8 O.O.3d 70, 374 N.E.2d 1258, this court again unanimously held antistacking provisions in an uninsured policy to be unenforceable when separate coverages were available from separate policies covering different vehicles. Time after time, this court held antistacking provisions to be in contravention of R.C. 3937.18.

The General Assembly responded to this developed line of cases by adding the following provision to the statute:

"Any automobile liability or motor vehicle liability policy of insurance that includes uninsured motorist coverage may include terms and conditions that preclude stacking of uninsured motor vehicle coverages." 138 Ohio Laws, Part I, 1458, 1459.

This court, in Karabin v. State Auto. Mut. Ins. Co. (1984), 10 Ohio St. 3d 163, 10 OBR 497, 462 N.E.2d 403, held that this amendment was "unambiguous," and expressed the will of the General Assembly to permit insurers to preclude stacking in all circumstances. In later cases the court held that R.C. 3937.18(G) gives insurance companies a license to contractually preclude the stacking of separate uninsured/underinsured coverages, irrespective of the number of policies involved, the number of premiums paid, or the number of vehicles covered, provided that the antistacking language is "unambiguous," "clear," and "conspicuous." Dues v. Hodge, supra.

The current version of the statute provides:

"(G) Any automobile liability or motor vehicle liability policy of insurance that includes coverages offered under division (A) of this section [uninsured and underinsured coverages] may include terms and conditions that preclude stacking of such coverages." 139 Ohio Laws, Part II, 2936, 2938.

The present statute permits insurance companies to contractually preclude the stacking of coverages in "any *** liability policy." We find this provision to be ambiguous. It is unclear whether R.C. 3937.18(G) is intended to allow the contractual preclusion of intra-family stacking, inter-family stacking, or both.

"Intrafamily" stacking occurs when an individual or an entire family is insured by several separate uninsured/underinsured policies insuring different vehicles. When the individual or a family member is injured by an uninsured or underinsured motorist, he or she will try to combine, or stack, each of the policies' underinsurance limits to compensate the injured individual.

"Interfamily" stacking occurs when an individual has paid a premium for an uninsured/underinsured motorists policy and is riding in an automobile, which is owned by someone other than a family member living in the same household and is insured by a separate uninsured/underinsured motorists policy. When the individual is injured by an uninsured or underinsured motorist while riding in this automobile, he will seek to recover compensation from the policy insuring the automobile in which he was riding and his own uninsured/underinsured motorists policy for which he has paid a premium.

In light of the disfavor which antistacking provisions have received by this court in cases such as Curran, supra, and Volkmann, supra, we conclude that R.C. 3937.18(G) should be narrowly construed. Insurers may contractually preclude, intrafamily stacking -- the stacking of uninsured/underinsured limits of policies and coverages purchased by family members in the same household. Insurers may not contractually preclude interfamily stacking -- the aggregation of uninsured/underinsured limits of policies purchased by two or more people who are not members of the same household.

In intrafamily stacking situations, insurers can provide reduced premiums for clients who purchase multiple uninsured/underinsured policies for separate vehicles. If the premium has been reduced, it logically follows that benefits can be restricted. However, the injured individual in an interfamily stacking scenario seeks to combine the limits of two policies for which premiums have not been reduced because of their mutual existence. Because insurers are attempting to prevent the full payment of two policy limits resulting from the full, unadjusted premium payment of two unrelated insurance policies, the contractual preclusion of interfamily stacking is unconscionable. We do not believe that the legislature intended to sanction such a practice.

With this reading of R.C. 3937.18's scope, the cases decided prior to the 1980 enactment of division (E) breathe renewed life to the extent they apply to interfamily stacking. Because Hower v. Motorists Mut. Ins. Co. (1992), 65 Ohio St.3d 442, 605 N.E.2d 15, involves interfamily stacking, it is overruled. The case of Karabin, supra, and the first syllabus paragraph of Dues v. Hodge, supra, are limited to apply to intrafamily stacking only.

This interpretation of R.C. 3937.18(G) is consistent with the concerted effort of the General Assembly to force all motorists to maintain liability insurance coverage on motor vehicles being operated within the State of Ohio. The Financial Responsibility Act requires that all motorists have the "ability to respond in damages for liability," and provides severe penalties for failure to comply. R.C. 4509.01(K).

Regrettably, the General Assembly has not succeeded in its effort to force every motorist to maintain liability insurance

coverage.  While it is impossible to accurately measure the number, the best insurance industry estimate would indicate that fifteen to twenty-five percent of Ohio motorists are driving without any liability insurance coverage. New York Times, September 3, 1990, A-10.  The purchase of full uninsured/underinsured coverage is  the only possible means for responsible motorists to protect themselves and their families.

By applying the above holding to the facts in this case, we conclude that Mary and Donald, because they are members of the same household, may not stack the limits of their two uninsured/underinsured policies with Motorists.  Because Debbie Savoie is only an insured in one of these policies, she does not qualify to stack the limits.

The holding of the court of appeals on the issue of stacking is affirmed.

### III

Finally, this court considers how the money paid by the tortfeasor's liability insurer affects the Savoies' ability to collect from their underinsurance carrier.  In Part I of this opinion, we held that the Savoies were entitled to collect up to $225,000 from the tortfeasor's liability carrier, Grange.

The Savoies are insureds in two uninsured/underinsurance policies with Motorists, each having limits of $100,000 per person, $300,000 per accident limits.  As a result of their wrongful death claims, the Savoies seek to recover from these policies.

Motorists argues that it is not liable to the Savoies at all because the $100,000 per person, $300,000 per occurrence limits of its underinsurance policy are identical to the limits of the tortfeasor's liability policy, and hence the tortfeasor was not underinsured.  Hill v. Allstate Ins. Co. (1990), 50 Ohio St. 3d 243, 553 N.E.2d 658.

In order to arrive at the proper conclusion in this case, it is critical to review the purpose of R.C. 3937.18, which explains how monies received from a tortfeasor's liability insurer reduce, or do not reduce, the limits of an underinsurance policy.   An individual covered by an underinsurance policy is entitled to receive compensation in an amount no less than what he would receive if he had been injured by an uninsured motorist. James v. Michigan Mut. Ins. Co. (1985), 18 Ohio St.3d 386, 18 OBR 440, 481 N.E. 2d 272. Thus, underinsured motorists who suffer from injuries caused by an automobile accident are entitled to collect up to the full limits of their underinsurance policy to the extent that their damages exceed the amounts which the tortfeasor's insurer has already paid to them.  The Savoies may collect up to the limits of their policy with Motorists to the extent that their damages exceed the $225,000 which they are entitled to receive from Grange.

In Hill v. Allstate Ins. Co., supra, a majority of this court held without elaboration that an underinsurance carrier avoids responsibility to its insureds when the limits of its policy are identical to the limits of the tortfeasor's liability policy. This decision incorrectly construes R.C. 3937.18, and is now expressly overruled.

In Part I of this opinion, we concluded that the claim of each of the Savoies is a separate claim and is entitled to its

own per person policy limit under the terms of the tortfeasor's liability policy. We have not addressed whether each of the Savoies, who are also insureds in an underinsured policy, is entitled to a separate per person limit or whether all claims must be consolidated into one per person policy limit.

This court's holding in Wood v. Shepard, supra, is completely dispositive of this issue. According to Wood, each insured, who under an underinsured motorists policy has the right to have a wrongful death action brought in his or her name pursuant to R.C. 2125.01, has a separate wrongful death claim subject to a separate per person policy limit. See, also, Motorists Mut. Ins. Co. v. Andrews (1992), 65 Ohio St. 3d 362, 604 N.E.2d 142.

Despite previous attempts by this court to restrict the application of Wood, we hold today that it remains good law in Ohio. Each person, who is covered by an uninsured/underinsured policy and who is presumed to be damaged pursuant to R.C. 2125.01, has a separate claim subject to a separate per person policy limit.

Two cases, Burris v. Grange Mut. Co., supra, and State Farm Auto. Ins. Co. v. Rose, supra, narrow the holding in Wood. To the extent they do so, they are overruled. Paragraph two of the syllabus of Dues v. Hodge, supra, is limited to apply only to cases involving a single bodily injury which has not resulted in wrongful death.

By applying the holding in Wood v. Shepard, supra, to the facts in this case, we conclude that Mary, Donald, and Debbie Savoie are each entitled to recover up to the $100,000 "per person" policy limits in the Motorists underinsurance policy, to the extent that each family member's damages exceed the payments which each has received from Grange; however, in no event should Motorists be obligated to pay more than a total of $300,000. The holding of the court of appeals addressing the extent that underinsured motorists coverage is set off by the tortfeasor's liability coverage is reversed.

Judgment affirmed in part<br>
and reversed in part

A.W. Sweeney, Douglas, Resnick and F.E. Sweeney, JJ., concur.

Moyer, C.J., and Wright, J., dissent.

Douglas, J., concurring. For far too long now various majorities of this court have been attempting, in interpreting liability, uninsured and underinsured automobile insurance policies, to place square legal pegs in round legal holes. Because of this, the law in this area has become increasingly confused. Today, despite caustic dissents, Justice Pfeifer has attempted to bring some semblance of order to what most reasonable persons with knowledge and interest in the field concede is an area of the law that badly needs clarification. Justice Pfeifer inherited this problem -- he was not a part of creating the admitted confusion. While not all of us in the majority agree with every detail in Justice Pfeifer's opinion,[1] his valiant effort will be of immeasurable help.

It is important to now recognize that this court has been attempting to apply the same law to differing fact patterns and that the approach has not, cannot and will not work. We should recognize, and Justice Pfeifer's opinion does so, that

uninsured-motorist cases are different from underinsured-motorist cases; that multiple-claimant cases are different from single-claimant cases; that cases involving wrongful death are different from those where death is not involved; and that cases where there is a tortfeasor liability policy are different from those where there is no liability policy.

Thus, we have cases (1) where the tortfeasor is insured and there is only one injured claimant; (2) where the tortfeasor is insured and there is more than one injured claimant; (3) where the tortfeasor is insured and there is a single wrongful death; (4) where the tortfeasor is insured and there are injured claimants and a wrongful death claimant or claimants; (5) where a tortfeasor is uninsured and there are single or multiple injured claimants and single or multiple wrongful death claimants and any or all of such claimants have uninsured-motorist coverage and underinsured-motorist coverage. While this list is not exhaustive, it makes the point that given different fact patterns, the law, as applied to cases with differing facts, will also be different when all of the language of R.C. 3937.18 is considered and when R.C. 2125.01 and 2125.02 are factored into the equation.

While there are many examples of how this court, in this field, has taken the law applying to one fact pattern and forced that law onto another differing fact pattern in order to reach a desired result, one such example will suffice.

Wood v. Shepard (1988), 38 Ohio St.3d 86, 526 N.E.2d 1089, was a case where (1) the tortfeasor was insured; (2) one victim was killed; (3) three victims were injured; and (4) the killed and injured parties had an underinsured-automobile insurance policy which was the subject of the action. State Farm Auto. Ins. Co. v. Rose (1991), 61 Ohio St.3d 528, 575 N.E.2d 459, involved (1) an insured tortfeasor with a liability policy; and (2) one victim of wrongful death. The issue involved the extent of the coverage available under the tortfeasor's liability policy -- and had nothing to do with underinsured-motorist coverage, the question presented by Wood.

Notwithstanding this, the majority in Rose, in its zeal to weaken, in some way, the holding in Wood, said, at 532, 575 N.E.2d at 462, that "* * * we further limit the holding in Wood v. Shepard, supra, and find it applicable only to those instances where the policy limitations in uninsured or underinsured motorist provisions do not track the corresponding limitation on liability coverage, and are ambiguous on their face," -- whatever that means. The majority clearly took apples and compared them with oranges, thereby bringing about the exact result predicted by Justice Asher Sweeney in his dissenting opinion in Rose, wherein he said that "[b]y further 'limiting' the well-reasoned decision in Wood v. Shepard * * *, the members of the present majority create more uncertainty in this area of law at the expense of the policyholders who will receive less than Ohio law entitles them to in their policies of automobile insurance." Rose, supra, 61 Ohio St.3d at 533, 575 N.E.2d at 462-463 (Sweeney, J., dissenting).

At the very least, the majority opinion is returning us to square one, whence we can move step-by-step in a logical, properly reasoned and statutorily based manner. Justice

Pfeifer's contribution to this salutary goal should be applauded -- not maligned.

I concur.

F.E. Sweeney, J., concurs in the foregoing concurring opinion.

FOOTNOTE:
1    As an example, I do not agree with the citation, as used, to Section 19a, Article I of the Ohio Constitution.


Moyer, C.J., dissenting.    I respectfully dissent from Part II of the majority's opinion because I believe it contradicts the clear intent of the General Assembly and overrules recent, well-reasoned decisions of this court recognizing that intent.  In cases preceding 1980, this court held that provisions barring the stacking of uninsured and underinsured coverages violated public policy and were thus unenforceable.  Grange Mut. Cas. Co. v. Volkmann (1978), 54 Ohio St.2d 58, 8 O.O.3d 70, 374 N.E.2d 1258; Curran v. State Auto. Mut. Ins. Co. (1971), 25 Ohio St.2d 33, 54 O.O.2d 166, 266 N.E.2d 566.  In 1980, the General Assembly enacted what is now R.C. 3937.18(G), which provides:

"Any automobile liability or motor vehicle liability policy of insurance *** may include terms and conditions that preclude stacking of [uninsured and underinsured] coverages."

This court correctly and unanimously interpreted this statute as a legislative countermand of Volkmann and Curran. Karabin v. State Auto. Mut. Ins. Co. (1984), 10 Ohio St.3d 163, 10 OBR 497, 462 N.E.2d 403.  In Karabin, Dues v. Hodge (1988), 36 Ohio St.3d 46, 521 N.E.2d 789, and most recently in Hower v. Motorists Mut. Ins. Co. (1992), 65 Ohio St.3d 442, 605 N.E.2d 15, we held that such clauses were enforceable when clear, conspicuous, and unambiguous.

Now, a majority of this court holds that such clauses are unenforceable to preclude "interfamily" stacking of coverages in separate policies.  The action of the majority defies not only logic and sound jurisprudence but also, more importantly, the General Assembly.

The majority no longer supports the reasoning of Dues because it is concerned that insurers are taking advantage of insureds who purchase insurance policies without knowing the import of the antistacking language they contain.  Yet the very purpose of the standard we enunciated in the first paragraph of the syllabus of Dues, that these provisions must be "unambiguous," "clear," and "conspicuous," was to ensure that those who purchased policies did understand the import of the antistacking language.  The majority even admits that the language in the Motorists policies satisfies the Dues test. Although the majority properly holds that appellant may not stack coverages in this case, it does not adequately explain why Dues does not protect all insureds.  Even in an interfamily situation, the policy language cannot simultaneously be clear, unambiguous, and conspicuous on one hand, but on the other be so confusing that insureds do not understand its import.

The majority further asserts that Dues "broadly contravened the line of cases which was developing prior to the enactment of R.C. 3937.18(E), now 3937.18(G) in 1980."  This is simply not so.  Rather, the General Assembly in enacting R.C.

3937.18(E) countermanded those cases. Karabin and Dues merely recognized that fact.

The distinction is pivotal. When the General Assembly enacts a valid, constitutional law that reverses or alters law that this court has announced, this court is bound to follow that law. To do otherwise violates the fundamental principle of separation of powers.

The majority admits that the enactment of R.C. 3937.18(G) was a "response" to our pre-1980 cases holding antistacking provisions unenforceable. It further admits that this court, in Karabin, supra, a unanimous decision, recognized this statute to be a declaration permitting antistacking provisions. The majority then concludes, however, that R.C. 3937.18(G) is somehow ambiguous and in need of judicial construction. Specifically, the majority contends that the words "any *** liability policy" are "unclear" and "not clarified anywhere in the statute." What is there to clarify? The word "any" is defined as: "concerning a being or thing of the sort named, without limitation as to which, and thus constructively of every one of them, since every one may in turn be taken as a representative ***." (Emphasis added.) 1 Oxford English Dictionary (2 Ed. 1989) 539. Nevertheless, the majority finds "any *** liability policy" to be ambiguous and uses this perceived ambiguity to conclude that the phrase refers, not to any liability policy without restriction, but only to those liability policies held within a single family. In creating this distinction, the majority's muse outshines even that of appellant's counsel, who never argued or briefed it at any stage in this proceeding. Furthermore, we rejected a similar distinction, between interpolicy and intrapolicy stacking, in Karabin. There is likewise scant justification for the majority's distinction between interfamily and intrafamily stacking.

By its tortured reading of R.C. 3937.18(G) and its resurrection of reasoning similar to that rejected in Karabin, the majority "breathe[s] renewed life" into the pre-1980 cases that held antistacking clauses unenforceable. In resuscitating these cases, however, the majority reads the statute partially out of existence. R.C. 3937.18(G) traveled through two committees, the House of Representatives, the Senate, and across the Governor's desk before it became law. It should take more than a simple majority of the members of this court to unmake it.

In addition to the disrespect that the majority shows for stare decisis, its rulings violate an even more fundamental tenet of our system of government -- that of separation of powers.

The framers of the federal Constitution well understood the importance of the separation of powers. The issue was a central concern in the constitutional debates, and received significant attention in The Federalist Papers. James Madison, according to one commentator, advocated the independence of each branch of government as a counterpoise against any one branch imposing its will on that of the others. White, Philosophy, The Federalist, and the Constitution (1987) 161.

Madison's own words confirm this view: "The accumulation of all powers legislative, executive, and judiciary in the same

hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."  The Federalist (1788), No. 47.  And further, "[i]n framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place, oblige it to control itself.  The Federalist (1788), No. 51.

Maintaining separation of powers concerned Alexander Hamilton as well.  He wrote in The Federalist (1787), No. 9, "[t]he regular distribution of power into distinct departments; the introduction of legislative balances and checks *** are means, and powerful means, by which the excellences of republican government may be retained and its imperfections lessened or avoided."  In The Federalist (1788), No. 71, Hamilton wrote, "[t]he same rule, which teaches the propriety of a partition between the various branches of power, teaches us likewise that  this partition ought to be so contrived as to render the one independent of the other."

The Supreme Court of the United States has emphasized the necessity of maintaining separation of powers.  It has stated that it is "essential to the successful working of this system" to prevent the encroachment of one branch upon the powers of another.  Kilbourn v. Thompson (1881), 103 U.S. 168, 191, 26 L.Ed. 377, 387.  In Myers v. United States (1926), 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160, Justice Brandeis, in dissent, wrote that although friction between the branches of government is inevitable, this friction has the salutory effect of precluding any one branch from exercising arbitrary power over any other. Id. at 293, 47 S.Ct. at 85, 71 L.Ed. at 242-243, (Brandeis, J., dissenting.)  And Justice Sutherland stated the following in Humphrey's Executor v. United States (1935), 295 U.S. 602, 629-630, 55 S.Ct. 869, 874, 79 L.Ed. 1611, 1620:  "The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, or either of the others *** is hardly open to serious question.  So much is implied in the very fact of the separation of the powers of these departments by the Constitution, and in the rule which recognizes their essential co-equality."

The Supreme Court of Ohio has stated that although Ohio has no specific constitutional provision embodying the concept of separation of powers, the doctrine is implicit in the entire framework of the Constitution.  South Euclid v. Jemison (1986), 28 Ohio St.3d 157, 28 OBR 250, 503 N.E.2d 136.  This court has long recognized the importance of the principle of separation of powers between the legislative and judicial branches of government.  In 1919, this court stated, "[p]robably our chief contribution to the science of government is the principle of the complete separation of the three departments of government, executive, legislative and judicial.  No feature of the American system has excited greater admiration."  State ex rel. Greenlund v. Fulton (1919), 99 Ohio St. 168, 187, 124 N.E. 172, 177.

This court has considered the argument that the common law could limit or supersede validly enacted statutes. In Leis v. Cleveland Ry. Co. (1920), 101 Ohio St. 162, 128 N.E. 73, a

party asserted that two city ordinances were invalid because they created a degree of care greater than that which existed at common law.  This court rejected the argument, reasoning that "there is no guaranteed right in the rules of the common law as guides of conduct and they may be added to or repealed by legislative authority ***.  'The law itself, as a rule of conduct, may be changed at the will *** of the legislature, unless prevented by constitutional limitations.  Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances.'"  Id. at 165, 128 N.E. at 74.

This court has also considered, and consistently rejected, the argument that a particular Act of the General Assembly should not be enforced because it was unwise or unreasonable. In Pohl v. State (1921), 102 Ohio St. 474, 475, 132 N.E. 20, 21, reversed on other grounds, 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047, for example, a party challenged a statute that prohibited certain types of instruction in public and parochial schools.  This court stated:

"Courts do not sit to review the wisdom of legislative acts, nor do they possess such power.  On the contrary, the policy, the advisability, and the wisdom of all legislation, subject to the veto of the governor and the referendum of the people, are subjects for legislative determination exclusively.  The inexpediency, injustice or impropriety of a legislative act is not a ground upon which the court may declare the act void.  The remedy for such evils must be sought by an appeal to the justice and patriotism of the legislature itself."

The legislature is the primary judge of the needs of public welfare, and this court will not nullify the decision of the legislature except in the case of a clear violation of a state or federal constitutional provision.  Williams v. Scudder (1921), 102 Ohio St. 305, 131 N.E. 481, paragraphs three and four of the syllabus.

For its own part, this court has been fervent in protecting its own branch from encroachment by the legislature.  Accordingly, this court has invalidated numerous enactments of the General Assembly that intrude into the exclusive powers of this court.  Relying specifically on the doctrine of separation of powers, this court invalidated R.C. 4509.101 to the extent that it permitted an appeal from a decision of a trial court to the Registrar of Motor Vehicles. South Euclid v. Jemison, supra, at paragraph one of the syllabus.  See, also, Cincinnati Polyclinic v. Balch (1915), 92 Ohio St. 415, 111 N.E. 159, paragraph two of the syllabus (invalidating a portion of a statute to the extent that it purported to limit the appellate jurisdiction of the court of appeals); Schario v. State (1922), 105 Ohio St. 535, 138 N.E. 63, paragraph four of the syllabus (invalidating an Act purporting to establish a time limit within which a court of appeals had to perform a judicial function); Rockey v. 84 Lumber Co. (1993), 66 Ohio St.3d 221, 611 N.E.2d 789 (invalidating R.C. 2309.01 as in conflict with Civ.R. 8[A]). In a case following the holding of Rockey, supra, this court, in an opinion written by a member of the majority in the instant case, reaffirmed its "great respect for the General

Assembly and *** great deference to its enactments ***."  In re Coy (1993), 67 Ohio St.3d 215, 219,      N.E.2d    ,    .

Conversely, this court has not been unaware of the limitations upon its own power to create or alter certain rules, even those that directly affect the judicial system.  Thus we held that the court lacked power to alter a statute concerning the physician-patient privilege.  We reasoned that we must defer to the legislature when the rule involves a substantive, and not procedural, right.  State v. Smorgala (1990), 50 Ohio St.3d 222, 553 N.E.2d 672, paragraph two of the syllabus.

The teaching of these cases is that for generations this court has recognized the distinction between the roles of the legislative and judicial branches.  It has enforced this distinction both against itself and against Acts of the General Assembly.  Having steadfastly protected the judicial branch from encroachment by the legislature, this court should now reciprocate and refrain from judicially limiting legislation whose result it simply does not like.

I dissent also from paragraphs one, three and four of the syllabus.  My primary objection to these holdings, which overrule three recent decisions and limit another, is this court's continued disrespect for stare decisis.  I wrote to oppose this trend in another recent case, Gallimore v. Children's Hospital (1993),     Ohio St.3d    ,     N.E.2d    (Moyer, C.J., dissenting), and those principles apply equally here.  There has always been tension between certainty and stability in the law and the drive to satisfy a judge's individual desire to "do justice."  I am concerned, however, with that aspect of justice that requires that the same fact pattern be treated in a similar manner.  To do otherwise is to abandon "justice" completely.  This rule applies with special force in cases of statutory interpretation, where the legislature is the appropriate body to make any needed corrections.

In Burris v. Grange Mut. Cos. (1989), 46 Ohio St.3d 84, 545 N.E.2d 83, and State Farm Auto. Ins. Co. v. Rose (1991), 61 Ohio St.3d 528, 575 N.E.2d 459, this court considered arguments similar to those raised here but refused to extend Wood v. Shepard (1988), 38 Ohio St.3d 86, 526 N.E.2d 1089, to apply to liability coverage.  The majority overrules these cases, asserting that the framers of the Ohio Constitution, the General Assembly and this court have all indicated that "damages for wrongful death claims should not be limited." Section 19a, Article I of the Ohio Constitution, however, states only that wrongful death damages shall not be limited "by law."  (Emphasis added.)  This means that there may be no artifically imposed cap, by statute or judicial decision, on total damages recoverable for wrongful death.  See Kennedy v. Byers (1923), 107 Ohio St. 90, 96, 140 N.E. 630, 632-633.  It does not mean, nor does any pronouncement by this court or the General Assembly mean, that no insurance policy -- a contract between the insured and the insurer for which the insured has paid a premium for certain levels of coverage -- may limit a provider's liability if that policy clearly and unambiguously so provides.  Indeed, if a provider's liability cannot be limited by contract, might one argue that the $300,000 per

accident limits of the Grange and Motorists policies are unenforceable "limitations" of wrongful death damages?  Even the majority does not contend that to be the case.  To do so would eviscerate the insurance law of Ohio created by the General Assembly.

Citizens, whose conduct is bound by it, expect the law to be certain, speedy and relatively inexpensive.  We frustrate this goal by creating a climate in which it is impossible to predict what this court will do next.

Wright, J., concurs in the foregoing dissenting opinion.

Wright, J., dissenting.  I admire the measured tone adopted by the Chief Justice in his incisive and compelling dissent, and certainly concur in same.  I would not and could not have been so restrained in addressing the majority's lack of deference to the clear will of the General Assembly and disregard for the doctrine of stare decisis.