NEWTON, Admr., et al., Appellants,

v.

OHIO UNIVERSITY SCHOOL OF OSTEOPATHIC MEDICINE; Seifer, Appellee.

[Cite as *Newton v. Ohio Univ. School of Osteopathic Medicine* (1993), 91 Ohio App.3d 703.]

Court of Appeals of Ohio,
Franklin County.

Nos. 93AP–818, 93AP–841.

Decided Nov. 23, 1993.

*Dwight D. Brannon & Assoc.* and *Dwight D. Brannon,* for appellants.

*Lee Fisher,* Attorney General, *Susan M. Sullivan, Catherine M. Cola* and *Susan C. Walker,* Assistant Attorneys General, for appellee.

TYACK, Judge.

In 1988, the Ohio University School of Osteopathic Medicine, the Ohio University Osteopathic Medical Center, Inc., and William J. Seifer, D.O., entered into an arrangement under the terms of which Dr. Seifer would provide direct care for obstetrics and gynecology patients; would supervise interns, residents and medical students at a private hospital; and would prepare appropriate reports and other paperwork. Much of the work was to be performed at the private hospital, Grandview Hospital and Medical Center. The interns and residents were employees of the hospital. Some of the work was performed at an affiliated clinic run by Lebanon Family Practice Physicians, Inc., in Lebanon, Ohio.

On March 7, 1990, Tammy R. Newton first saw Dr. Seifer at the clinic managed by Lebanon Family Practice Physicians, Inc. Tammy was pregnant for the third time. She was expecting twins. Her "due date" was in late July 1990.

Tammy was monitored by Dr. Seifer from the March appointment onward. A series of ultrasounds were done. An ultrasound conducted on July 9, 1990 indicated that both twins were in transverse lie, meaning the lie of the fetus is perpendicular to the lie of the maternal abdomen.

Newton went into false labor on more than one occasion and was sent home from Grandview Hospital without delivering. On July 14, 1990, she presented herself to the hospital and was found to be in labor. Her care was initially monitored by staff from Grandview Hospital, including Cathy Coats, D.O., who was a first-year resident under the supervision of Dr. Seifer.

Attempts were made to contact Dr. Seifer on the afternoon of July 14, 1990, but he was either unavailable or unwilling to come to the hospital because he was participating in a golf tournament. After he became aware of Newton's presence at the hospital and apparently after his participation in the golf tournament was completed, Dr. Seifer went to the hospital to evaluate the situation. An ultrasound was conducted, followed by two flat plate x-rays. The results of the ultrasound and the x-rays are subject to varying recollection by different professionals. Dr. Coats later recalled one of the x-rays as showing that one twin was in a frank breech position and the other twin was in a transverse lie. These positions were noted in the hospital records at 9:25 p.m., on July 14, 1990.

Dr. Seifer left the hospital and went to dinner. He then engaged in other activities and, at approximately 2:00 a.m., he returned to the hospital. Newton had not yet delivered either twin. Dr. Seifer later claimed that at least one of the x-rays indicated that the first twin was in a breech position. The second twin he claimed was in a cephalic, or headfirst, position.

Dr. Seifer, although he was over sixty years of age and had spent many years as an OB/GYN, had never delivered a child by Caesarean section. Indeed, he claimed that he was incapable of performing a Caesarean section and that he was not licensed to perform the operation. As a result, he had entered into an agreement with physicians at Grandview Hospital that a surgeon or other physician capable of performing a Caesarean section would be on call to respond as his backup should a Caesarean section need to be performed. Under the agreement, the backup surgeon or physician was to respond to the hospital not later than thirty minutes after being summoned. No provision was made for a "crash" or immediate Caesarean section.

The delivery of twins involves risks which are not present in situations involving a single fetus. One of the risks is that after the delivery of the first twin, the changes in the uterus which follow may cause the placenta, which surrounds the second twin, to separate partly or totally from the uterine wall. This separation, known as an abruption, causes blood and oxygen which flows down the umbilical cord from the mother to the fetus to be reduced or, in the worst case, to be cut off completely. The fetus then can go immediately into acute fetal distress. A lack of oxygen soon causes brain cells to die, leading to serious harm to the fetus and possibly to death.

Dr. Seifer did not arrange for a physician who was capable of performing a Caesarean section to be present before he began trying to extract the first twin, who was in a breech position. Nor did Dr. Seifer request such a physician to deliver both twins by Caesarean section. He also made no effort to have a physician available to perform a crash Caesarean section.

Dr. Seifer proceeded to deliver the first twin. After that twin was delivered, he did not notice that the external fetal monitor which was placed over the second twin was no longer recording any heartbeat. He still made an attempt to deliver the second twin vaginally. During this time frame, he was increasing the doses of Pitocin being administered to Newton.

Despite the 9:25 entry in the hospital records, Dr. Seifer would later claim that he did not know that the second twin was in a transverse lie until the arm of the twin emerged from the uterus (at approximately 2:50 a.m., on July 15, 1990). A fetus in the transverse lie position cannot normally be delivered vaginally and must be delivered by Caesarean section.

Dr. Seifer, after viewing the child's arm, left the delivery room and called the physician who was to be his backup. The backup physician arrived approximately thirty minutes later, but the delivery room was not completely prepared for a Caesarean section. The second twin was delivered by Caesarean section over thirty minutes after the backup physician was summoned and over forty-five minutes after the twin had gone into acute fetal distress as a result of an

abruption. The second twin survived for twenty days before dying as a result of the complications attendant to its birth.

On May 22, 1991, Tammy Newton and the other family members filed a lawsuit against Dr. Seifer, Grandview Hospital, Dr. Coats, the physician who finally delivered the second twin and various other parties. The lawsuit was filed in Montgomery County, Ohio, where the hospital is located and where the deliveries occurred.

Dr. Seifer filed a motion asking that he be dismissed from the lawsuit on the theory that he was a full-time employee of the Ohio University School of Osteopathic Medicine and, therefore, a full-time employee of the state of Ohio. As a result, he alleged, he was immune from suit.

The trial court in Montgomery County sustained the motion, ruling that the lawsuit could not proceed until the Ohio Court of Claims had made a final determination as to whether Dr. Seifer was immune.

The Newton family then filed a lawsuit against Dr. Seifer and the Ohio University School of Osteopathic Medicine in the Court of Claims. The Ohio Court of Claims eventually found that Dr. Seifer was immune and that no just cause for delay existed. The family (hereinafter "appellants") have now pursued an appeal to this court, assigning six errors for our consideration:

"1. The Court of Claims' determination that defendant is entitled to immunity was against the manifest weight of the evidence.

"2. O.R.C. § 2743.02(F) is unconstitutional as it relates to actions and claims for wrongful death that are asserted against state employees and/or entities.

"3. A determination of immunity made by the Court of Claims regarding a state employee is a final appealable order pursuant to O.R.C. § 2505.02 and Civ.R. 54(B).

"4. The procedure of having to first proceed in the Court of Claims, and then proceeding in the court of common pleas, or of having a companion action pending in a court of common pleas stayed pending the Court of Claims outcome, provides an inadequate remedy at law, as it is unduly burdensome, prejudicial, and time consuming, so as to be inherently unfair to tort plaintiffs such as those in the instant action.

"5. The determination by the Court of Claims that defendants are immune from liability is in conflict with and offends the Ohio Rules of Civil Procedure.

"6. The Court of Claims erred procedurally by not providing appellants an opportunity for an evidentiary hearing to make their case that appellees [sic] are not immune from tort liability."

Such other facts as are pertinent will be discussed under the applicable assignment of error.

■ The third assignment of error sets forth an initial hurdle to be cleared by appellants before the other assignments of error can be addressed. If the judgment entry in the Court of Claims granting immunity to Dr. Seifer is not a final appealable order, then no appeal can be pursued at this time. "Final appealable orders" are defined by R.C. 2505.02 as follows:

"An order that affects a substantial right in an action which in effect determines the action and prevents a judgment, an order that affects a substantial right made in a special proceeding or upon a summary application in an action after judgment, or an order that vacates or sets aside a judgment or grants a new trial is a final order that may be reviewed, affirmed, modified, or reversed, with or without retrial.

"When a court issues an order that vacates or sets aside a judgment or grants a new trial, the court, upon the request of either party, shall state in the order the grounds upon which the new trial is granted or the judgment vacated or set aside."

The meaning of R.C. 2505.02 has recently been clarified by the Ohio Supreme Court by its ruling in *Polikoff v. Adam* (1993), 67 Ohio St.3d 100, 616 N.E.2d 213. The syllabus to the *Polikoff* case reads:

"Orders that are entered in actions that were recognized at common law or in equity and were not specially created by statute are not orders entered in special proceedings pursuant to R.C. 2505.02. (*Amato v. Gen. Motors Corp.* [1981], 67 Ohio St.2d 253, 21 O.O.3d 158, 423 N.E.2d 452, overruled.)"

The Supreme Court of Ohio has also indicated that a determination of immunity pursuant to R.C. 9.86 affects a substantial right in a case. See *Nease v. Med. College Hosp.* (1992), 64 Ohio St.3d 396, 596 N.E.2d 432.

A panel of this court recently read *Polikoff* and *Nease,* taken together, as indicating that a ruling which grants immunity pursuant to R.C. 9.86 is an order that affects a substantial right made in a special proceeding. We follow that reasoning and reaffirm the ruling of this court to that effect, which ruling was made in this very case.

As a result, we agree with the proposition of law set forth in appellants' third assignment of error. However, since the assignment of error does not literally claim an error by the trial court, we neither sustain nor overrule it.

■ The first assignment of error claims that the finding of immunity for Dr. Seifer was against the manifest weight of the evidence. Appellants argue that Dr. Seifer was not functioning simply as a full-time employee of the state of Ohio

when delivering Tammy Newton's twins. Appellants also assert that Dr. Seifer's conduct fell into the class of conduct for which R.C. 9.86 does not provide immunity.

R.C. 9.86 reads:

"Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

"This section does not eliminate, limit, or reduce any immunity from civil liability that is conferred upon an officer or employee by any other provision of the Revised Code or by case law. This section does not affect the liability of the state in an action filed against the state in the court of claims pursuant to Chapter 2743. of the Revised Code."

We are not prepared to say that Dr. Seifer's conduct was performed with malicious purpose, in bad faith or in a wanton manner. However, we believe that the evidentiary material in the record demonstrates that he was reckless.

The word "reckless" is not defined by statute for purposes of R.C. 9.86. However, R.C. 1.42 advises us:

"Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."

Webster's Ninth New Collegiate Dictionary (1987) 983, defines "reckless" as follows:

"[M]arked by lack of proper caution: careless of consequences."

Applying this definition, we believe that the record below clearly demonstrated that Dr. Seifer was reckless and the manifest weight of the evidence demonstrates recklessness. Even a lay person can well understand that when a child of more than seven pounds with its accompanying placenta and fluids is removed from an enormously expanded uterus, the uterus is going to contract a great deal. If a second fetus remains in the uterus while the contracting occurs, the placenta of the second fetus faces a serious risk of separating from the uterine wall or abrupting. If an abruption occurs, oxygen to the brain of the fetus can be cut off. If the fetus does not have the oxygen rapidly restored through the action of its own heart and breathing process, the fetus will soon suffer serious brain damage

or death. All these risks were well known to Dr. Seifer and were basically disregarded by him because he claimed that he had been fortunate enough not to have an abruption occur during his previous deliveries of twins.

Further, Dr. Seifer claims that he simply did not pay attention to the fetal monitor and had no one else monitoring it when the monitor indicated that the fetus was in acute fetal distress. This lapse apparently added ten minutes of delay between the fetus going into acute distress and the telephone call for help.

Third, if the recollection of Dr. Coats is correct, she, Dr. Seifer and the staff at Grandview Hospital tended to Newton for over five hours of labor after all should have known that one of Newton's twins could not be delivered vaginally. Instead of acknowledging this situation and assuring the rapid availability of the services of a physician and/or a surgeon who could deliver the child by Caesarean section, the labor was allowed to continue and indeed the Pitocin doses were increased, causing more and harder contractions to be inflicted on the fetus who could not be born sideways from its transverse lie position.

Finally, Dr. Seifer was reckless in placing himself repeatedly in the position where help by way of a Caesarean section was thirty minutes away when a fetus went into acute fetal distress. We do not know, based upon the record, how many other children were placed at risk or harmed by this arrangement which allowed a fetus to go for as many as thirty minutes before a physician competent to perform Caesarean sections was able to arrive. We do know the risks to the fetuses had to be known, but were disregarded. Hence, Dr. Seifer, among others, was reckless.

As to the issue of Dr. Seifer's status as a state employee, by his own admission, he was an employee of two entities simultaneously. He agreed to a total pay of approximately $80,000 and was not aware of how that pay came to be divided, so that more than half was paid by a private corporation and less than half came directly from a state agency.

Dr. Seifer also served both the state and the private corporations simultaneously by treating patients at the same time that he was supervising residents, interns and students. Even in his supervision of residents and interns, he was supervising employees of a private hospital, Grandview Hospital.

Further, Dr. Seifer clearly exercised independent control over his schedule, consistent with a physician who was engaged in private practice. He was at liberty to participate in a golf tournament while a resident was supervising his patient who was in labor. He felt free to leave the hospital shortly after arriving and to stay away from the hospital for several hours while Dr. Coats continued to assist. Again, he acted more like a physician in private practice than like a teacher whose primary responsibility was to monitor a student.

This court has previously addressed the immunity issue for physicians who simultaneously engage in a private practice and supervise residents and interns. The reasoning behind *Katko v. Balcerzak* (1987), 41 Ohio App.3d 375, 536 N.E.2d 10, and *Latham v. Ohio State Univ. Hosp.* (1991), 71 Ohio App.3d 535, 594 N.E.2d 1077, applies equally well here.

As a result, we sustain the first assignment of error on the theory that Dr. Seifer was reckless and on the theory his relationship with the Ohio University Osteopathic Medical Center, Inc. took him outside the scope of the immunity contemplated by R.C. 9.86.

The remaining assignments of error suggest that statutory procedures set forth in R.C. Chapter 2743 and the procedures utilized here are defective because they are in conflict with applicable provisions of the Ohio Constitution; because they are in conflict with the Ohio Rules of Civil Procedure, which are grounded in the Ohio Constitution; and because the procedures simply are not fair to others harmed by tortfeasors who have ties to the state.

In *Rockey v. 84 Lumber Co.* (1993), 66 Ohio St.3d 221, 611 N.E.2d 1189, the Supreme Court of Ohio ruled at paragraph two of the syllabus:

"The Ohio Rules of Civil Procedure, which were promulgated by the Supreme Court pursuant to Section 5(B), Article IV of the Ohio Constitution, must control over subsequently enacted inconsistent statutes purporting to govern procedural matters."

The full effect of this decision has not yet been felt, especially the effect which the decision could have if the case means that the Ohio Rules of Civil Procedure have constitutional priority over the statutes enacted in regard to the Ohio Court of Claims.

Appellants assert that Civ.R. 19 and Civ.R. 19.1, which govern joinder, are in conflict with the statutes which govern procedure in the Ohio Court of Claims. Specifically, the primary tortfeasor may not be personally present in the litigation. As a result, appellants submit the fairness and justness of the proceedings are affected.

Appellants also submit that the procedures in the Ohio Court of Claims conflict with the Ohio Constitution in the right to a jury trial guaranteed by Section 5, Article I. Finally, appellants argue that, at least as a practical matter, the procedures limit the damages which are recovered in a wrongful death action, thereby conflicting with Section 19(A), Article I of the Ohio Constitution, which reads:

"The amount of damages recoverable by civil action in the courts for death caused by the wrongful act, neglect, or default of another, shall not be limited by law."

This last assertion may find support in the recent case of *Savoie v. Grange Mut. Ins. Co.* (1993), 67 Ohio St.3d 500, 620 N.E.2d 809, where the Supreme Court of Ohio noted at 504, 620 N.E.2d at 812:

"The General Assembly and this court have expressed the view that damages for wrongful death claims should not be limited.  * * * "

On the other hand, the Ohio Court of Claims is itself grounded in authority granted by the Ohio Constitution.  In 1912, the Ohio Constitution was amended to provide in Section 16, Article I:

"Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

Just last year, the Ohio Supreme Court affirmed in *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 595 N.E.2d 862, that immunity under R.C. 9.86 must be determined exclusively by the Ohio Court of Claims and that R.C. 2743.02(F) is constitutional in its requirement to that effect.  Presumably, the Ohio Supreme Court considered the corollaries to its ruling and approval of loss of rights and remedies which a grant of immunity under R.C. 9.86 causes to those who are injured by agents of the state, including those where claims involve wrongful death.

As a result, we feel bound to overrule the second, fourth and fifth assignments of error.

■ The sixth assignment of error, however, is sustained.  Although in some cases, perhaps even many cases, the determination as to immunity will involve simply an application of legal principles to agreed facts or clear facts, in other cases a genuine issue of credibility will exist.  Where conflicting, conclusory affidavits are present, the Ohio Court of Claims rarely will be able to resolve the issue unless it supplements the affidavits with live testimony.

Further, some scrutiny should be given to whether the same counsel can represent the individual and the state in this determination.  The individual who is sued has a strong interest in being found to be immune pursuant to R.C. 9.86.  The state's interests may be furthered by having the individual be found to have acted outside the scope of employment.

The present case highlights the conflict because the same ruling which granted immunity to Dr. Seifer had the effect of guaranteeing a major financial obligation on behalf of the state without potential for reimbursement from any malpractice insurance Dr. Seifer may have carried.

Again, the sixth assignment of error is sustained.

In summary, the first and sixth assignments of error are sustained.  The second, fourth and fifth assignments of error are overruled.  The third assign-

ment of error, being a proposition of law, is neither sustained nor overruled. As a result, the order of the Ohio Court of Claims is reversed as to its determination of immunity pursuant to R.C. 9.86. The cause is remanded with instructions to enter a new order finding Dr. Seifer not to be immune pursuant to R.C. 9.86 and for other appropriate proceedings.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded*
*with instructions.*

WHITESIDE, J., concurs.

CLOSE, J., concurs in part and dissents in part.

CLOSE, Judge, concurring in part and dissenting in part.

I concur completely in the holdings expressed in relation to the second, third, fourth and fifth assignments of error. The first and sixth assignments of error require further explanation.

The Court of Claims has made a factual determination in the first assignment of error that appellee is entitled to immunity. In order to reverse, it would be necessary for us to find that the trial court's attitude was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140. This judgment is supported by some competent, credible evidence going to all the essential elements of the case; it should not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. For that reason, I must respectfully dissent on the first assignment of error.

However, that does not mean that the procedure used by the Court of Claims to reach the decision relating to immunity from tort liability should be approved. Where the pleadings present a justiciable issue of fact, it would appear that the Court of Claims should be compelled to hold an evidentiary hearing where the evidence is disputed. It would seem that fundamental fairness would require that, at a minimum, appellants be provided an opportunity for a factual hearing before the Court of Claims determines that a cause of action against an individual would not accrue. Certainly, in most actions before the Court of Claims it would seem that the issue of whether an employee was within the scope of his or her employment would very well have undisputed facts. In the case at bar, both because of issues related to the Lebanon Family Practice Physicians, Inc., and the issue of willfulness discussed in the majority opinion, no such stipulation is possible. It appears inappropriate for a decision even to have been made without

evidence having been taken. I would, therefore, remand this case to the Court of Claims for an evidentiary hearing on the issue of immunity.