OPINION
This case presents yet another of a seemingly endless series of coverage disputes spawned by Savoie v. Grange Mut. Ins. Co. (1993), 67 Ohio St.3d 500 and Am. Sub. S.B. 20 (S.B. 20). The Plaintiffs/Appellants, William and Anne Wodrich, were first insured by Farmers Insurance of Columbus, Inc. (Farmers) and Mid-Century, Inc. (Mid-Century) in February, 1994, during the time when Savoie controlled. Originally, the Wodriches insured four vehicles on February 23, 1994, and then added a fifth vehicle the following day. Each policy of insurance had uninsured/underinsured motorist (UM/UIM) limits of $100,000/300,000, and separate premiums were charged on each policy for the coverage. At the time S.B. 20 became effective on October 20, 1994, the policies had been renewed once, in August, 1994. After the effective date of the Act, the policies were renewed in February, 1995, and again in August, 1995.
On September 24, 1995, the Wodriches were seriously injured in a motor vehicle accident and recovered $100,000 each from the tortfeasor's carrier. At the time of the accident, the Wodriches were riding on a 1984 Goldwing motorcycle, which was not one of the vehicles originally insured. However, two days before the accident, Mr. Wodrich sent a letter to his insurance agent to ask that coverage be put in place for the motorcycle. Although the agent did not receive the letter until after the accident, Farmers issued a policy on the motorcycle, with an effective date of September 22, 1995. In the letter, Mr. Wodrich had not asked for a specific coverage amount, and Farmers assigned the same policy limits as the other vehicles, i.e., $100,000/300,000.
After receiving payment from the tortfeasor, the Wodriches made claims with Farmers for UIM coverage, but coverage was denied. The Wodriches then filed suit against Farmers for breach of contract, estoppel, bad faith, and negligence in advising and selling insurance policies. Neither the agent who sold the insurance (Michael Stethem) nor Mid-Century was sued. Stethem was not a Farmers' employee, but he was precluded from selling policies of other insurance carriers if Farmers provided the product. Mid-Century's status is not precisely clear in the record. According to Farmers' District Manager, the parent company is located in Los Angeles, California, and Mid-Century is one of six divisions. Mid-Century is a company used for higher risk drivers. * * *
The six policies that the Wodriches had in effect at the time of their accident were as follows:
 1) Policy No. 25 13886 82 25, issued by Farmers for a 1984 Goldwing (the motorcycle policy);
 2) Policy No. 25 13814 69 22, issued by Farmers for a 1990 Chevrolet Van;
 3) Policy No. 25 13814 69 21, issued by Farmers for a 1992 Cadillac DeVille;
 4) Policy No. 25 13814 69 30, issued by Farmers for a 1986 Volkswagen Golf;
 5) Policy No. 25 13814 69 19, issued by Mid-Century for a 1967 Pontiac Tempest;
 6) Policy No. 25 13814 69 20, issued by Mid-Century for a 1988 Volkswagen Fox.
Additionally, the Wodriches had homeowners' insurance with Farmers at the time of the accident. That policy, No. F 91024, had $500,000 personal liability limits.
In a motion for partial summary judgment on the breach of contract claims, the Wodriches contended that they should be able to stack the coverages under their automobile and motorcycle policies. They also claimed their homeowners' policy qualified as motor vehicle insurance and that they were entitled to UIM coverage of $500,000 under that policy because they never rejected such coverage in writing. Farmers also filed a motion for summary judgment, but on all issues in the case, including the bad faith claims. In its motion, Farmers contended that anti-stacking language in the policies precluded stacking of coverages in the policies. Further, Farmers argued a lack of bad faith, in that the claims were denied in reliance on the law of Ohio at the time of the accident. Specifically, at the time, the amendments to R.C.3937.18 had been in effect for nearly a year. Finally, Farmers contended that Stethem was not negligent because he had no duty under the law either to notify insureds of changes in the law or to offer umbrella coverage. After consideration, the trial court granted summary judgment to Farmers and denied the Wodriches' partial motion for summary judgment. The Wodriches then appealed, and now raise the following assignment of error:
I. The trial court erred to the prejudice of Appellants by granting Appellee's motion for summary judgment and denying Appellants' Motion for Summary Judgment.
In support of this single assignment of error, the Wodriches assert six sub-arguments, as follows:
 1) Whether the renewal of a motor vehicle insurance policy containing UM/UIM coverage which occurs within the statutory two year guaranteed renewable period from the date the contract was initially purchased, which renewals are for the same policies and insuring the same vehicles with the same coverages and the same limits, and using the same policy numbers, represents not a new contract of insurance separate from the initial policy but instead represents the same contract of insurance not separate from the initial policy, such that the law regarding UM/UIM coverage in effect when the contract of insurance was initially purchased controls the rights and obligations of the parties.
 2) Whether purported anti-stacking language, which makes the anti-stacking provision subject to the law of the state of a future occurrence and hence unknown at the time of purchase of automobile insurance, is unenforceable since it is not clear, conspicuous, and unambiguous.
 3) Whether purported anti-stacking language that is not labeled as anti-stacking language, not set off from the rest of the policy, not in bold print, and uses technical language that is not familiar to the average lay person, is unenforceable since it is not clear, conspicuous, and unambiguous.
 4) Whether stacking of UM/UIM coverage is permitted when a single agency sells multiple policies with UM/UIM coverage from different companies with separate premiums.
 5) Whether as a matter of law homeowners insurance, which also qualifies as vehicle insurance, and for which the insured never rejected in writing UM/UIM coverage in the same amount of liability coverage, provides UM/UIM benefits to the insured under the homeowners policy.
 6) Whether genuine issues of fact exist that would exclude the granting of an insurer's motion for summary judgment when the insurer's district manager specifies duties and standards based on customs and practices in the industry which a jury could reasonably conclude were breached.
After considering the above arguments, we find several well-taken, at least in part. Accordingly, the decision of the trial court is reversed and remanded for further proceedings. Our analysis of each argument is set forth below.
 I
On October 1, 1993, the Ohio Supreme Court issued its decision in Savoie, holding that "[a]n underinsured claim must be paid when the individual covered by an uninsured/underinsured policy suffers damages that exceed those monies available to be paid by the tortfeasor's liability carriers." 67 Ohio St.3d 500
-01, syllabus three. The effect of this decision was to make UM/UIM coverage excess coverage, meaning that insureds could collect up to the full policy limits, to the extent their damages exceeded the amounts the tortfeasor's insurer had paid. AfterSavoie, the Ohio Supreme Court also held in Schafer v. Allstate
(1996), 76 Ohio St.3d 553, syllabus, that "each person who is covered by an uninsured motorist policy and who is asserting a claim for loss of consortium has a separate claim subject to a separate per person limit."
The effect of these decisions, if applied to the present case, would mean that Mr. Wodrich could potentially recover from Farmers up to $100,000 for his own bodily injury claim and up to $100,000 for his separate claim for loss of consortium. Likewise, Mrs. Wodrich could potentially recover up to $100,000 for her own bodily injury claim, and up to $100,000 for her loss of consortium claim. These claims in the aggregate would be subject, however, to the $300,000 per accident policy limits. Stacking of the policies is a separate issue, as Savoie only prevents insurers from prohibiting interfamily stacking, which is "the aggregation of uninsured/underinsured limits of policies purchased by two or more people who are not members of the same household." Savoie,67 Ohio St.3d at 500, syllabus 2. Even after Savoie, insurers were allowed to prohibit Intrafamily stacking, i.e., "the stacking of uninsured/underinsured limits of policies and coverages purchased by family members living in the same household." Id.
In enacting S.B. 20 (and amending R.C. 3937.18), the legislature declared its intent to supersede the holding inSavoie. In particular, the legislature stated that its intent was to allow an offset of the UIM limits against the amounts available for payment from the tortfeasor's liability coverage. Additionally, the legislature said that insurers could include provisions in their policies that would prohibit both intrafamily and interfamily stacking.
Subsequently, in Ross v. Farmers Ins. Group of Companies
(1998), 82 Ohio St.3d 281, the Ohio Supreme Court held that:
 For the purpose of determining the scope of coverage of an underinsured motorists claim, the statutory law in effect at the time of entering into a contract for automobile liability insurance controls the rights and duties of the contracting parties.
Id. at 281-82, syllabus. In the present case, the trial court found Savoie inapplicable because the Wodriches' insurance contracts expired and were renewed several times after their original creation and before the accident. The court relied on the Ohio Supreme Court's decision in Benson v. Rosler (1985),19 Ohio St.3d 41, and in particular on Benson's holding that "[s]tatutes pertaining to a policy of insurance and its coverage, which are enacted after the policy's issuance, are incorporated into any renewal of such policy if the renewal represents a new contract of insurance." In the trial court's opinion, the fact that the Farmers' policies had expired and were renewed several times before the accident made them "new" contracts of insurance. As a result, the court found that law in effect at the time of latest renewal, i.e. the amendments to R.C. 3937.18, would control.
On appeal, the Wodriches contend the trial court erred in failing to consider the effect of the guaranteed renewal provisions in R.C. 3937.18. Specifically, the policies in question (with the exception of the motorcycle policy) were first issued in February, 1994. At that time, Savoie was in effect. According to the Wodriches, the policies were guaranteed renewable for two years by R.C. 3937.31, or until February, 1996, which was after the date of the accident. As a result, the Wodriches claim the policies were not "new contracts" of insurance but were the same contracts, meaning that Savoie would control. Farmers' response is that under Ross, and more particularly, Benson, a new contract is formed each time a policy of insurance is renewed.
Ross does not address the factual situation involved in the present case, because the accidents in Ross all took place before the effective date of S.B. 20. Consequently, the court did not consider the issue of whether a policy in effect before S.B. 20, but renewed after the bill's effective date, must be a new contract incorporating the amendments, or may be a continuation of the previous contract. By comparison, Benson does offer some guidance on this issue.
In Benson, the policies of insurance were issued on May 6, 1980, and the accident occurred on November 13, 1981. At the time the polices were first issued, they contained anti-stacking language. However, the law since 1978 had prohibited anti-stacking provisions in insurance policies, based on the decision in Grange Mut. Cas. Co. v. Volkman (1978), 54 Ohio St.2d 58. Effective June 25, 1980, the legislature enacted R.C.3937.181(E), which superseded Volkman by allowing anti-stacking language. The Benson policies were renewed three times thereafter, for six-month periods, with the last renewal occurring on November 6, 1981. During that time, the insurer (Farmers) did not issue any endorsements, nor did it negotiate with the insureds about any modification of the contract.
The majority in Benson found that the anti-stacking law in effect at the time of the renewals became a part of the policies and gave "lawful force to the language as contained in the original policies relative to the stacking of insurance." Id. at 45. In reaching its decision, the court discussed R.C. 3937.31
(which has not since been amended), and stated that:
 [s]tatutes pertaining to a policy of insurance and its coverage, which are enacted after the policy's issuance, are incorporated into any renewal of such policy if the renewal represents a new contract of insurance separate from the initial policy. 12 Appleman, Insurance Law and Practice (1981) 166, Section 7041.
 The policies issued herein were written for six-month durations and were renewable for additional six-month periods at the limited option of the insuring company as provided by R.C. 3937.31. Although the statute provides that automobile insurance policies shall be issued "for a policy period of not less than two years or guaranteed renewable for successive policy periods totaling not less than two years * * *," such policies, when written for specific periods, may be considered term policies rather than continuing policies.
Id. at 44.
In our opinion, the important parts of the above comments are "if the renewal represents a new contract" and "may be
considered term policies rather than continuing policies" (emphasis added). In other words, the court was not saying that renewals must be new contracts. Instead, the court said they "may be" new contracts. Consistent with this approach, the court went on to consider the specific terms of the policies and concluded, based on the language used, that 1) the policies were term insurance; and 2) that a new contract of coverage was created when the policies expired at the end of the six-month period and the company subsequently accepted the premiums. The particular terms relied on in Benson were the following statements on the declarations page:
 "The policy shall expire at 12:00 o'clock noon standard time on the expiration date shown. The policy may be renewed for an additional policy term of six months each time the company offers to renew by sending a bill for the required renewal premium, and the insured pays said premium in advance of the respective renewal date. * * *"
Id. Additionally, the policies themselves stated under the conditions section as follows:
"8. Termination or Reduction of Coverage
* * *
"c. Automatic Termination
 "This policy is written for a 6 month period. * * * It will automatically terminate at the end of any one policy period for which you or your representative do not accept our offer to renew it. Your failure to pay the required renewal premium means that you have declined our offer."
Id.
In the present case, the trial court did not consider the language in the policies, but simply concluded that the policies were "new" because they had been renewed. We think this was error, since it was inconsistent with the approach taken inBenson. Normally, we could look at the policy language ourselves, to see if a new contract was formed. Unfortunately, however, the parties did not submit the correct policies or declaration pages to the trial court. Instead, the declarations pages and policies submitted were those in effect on the date of the accident. Although counsel for Farmers stated during oral argument that the policies were the same, a number of endorsements, for example, appear to be dated in 1995 and 1996. Moreover, the policies themselves do not indicate any original issue or revision date. Under the circumstances, we believe the best approach is to remand the case so that the trial court can consider the contents of the proper declaration pages and the actual policies and/or endorsements originally issued in February, 1994. See, e.g., Jones v. Jones (Dec. 13, 1996), Champaign App. No. 95CA-22, unreported (appellate courts may not add to the record before the trial court and decide the appeal on that basis).
In view of the fact that this matter is being remanded, we make the following additional points. First, the conclusion of the court in Benson about a "new contract" is puzzling, since one might wonder how the terms of a "new contract" could be defined by the original policy, at least absent a provision to that effect in the original policy. In this regard, the Benson court did not refer to a policy provision which stated that, upon renewal, the terms would be the same as those in the original policy. Absent such a provision, what would the terms of the "new contract" be? Such provisions may have existed and may have validated the court's conclusion, but the court did not refer to them. The decision in Benson is further puzzling because R.C. 3937.181(E) did not insert a specific provision in any policy, but simply gave insurers authority to include terms and conditions that precluded stacking. See, contents of R.C. 3837.181(E), as noted in Hower v.Motorists Mut. Ins. Co., (1992), 65 Ohio St.3d 442, 444. As was noted by the dissent in Benson, the policies as originally issued could not validly have included anti-stacking language, and no additional policies were issued after the law changed.19 Ohio St.3d at 48 (Brown, J., dissenting).
Furthermore, regarding guaranteed renewal, R.C. 3937.31
states that:
 (A) Every automobile insurance policy shall be issued for a policy period of not less than two years or guaranteed renewable for successive policy periods totaling not less than two years. Where renewal is mandatory, "cancellation," as used in sections 3937.30 to 3937.39 of the Revised Code, includes refusal to renew a policy with at least the coverages, included insureds, and policy limits provided at the end of the next preceding policy period. No insurer may cancel any such policy except pursuant to the terms of the policy, and in accordance with sections 3937.30 to 3937.39 of the Revised Code, and for one or more of the following reasons:
 (1) Misrepresentation by the insured to the insurer of any material fact in the procurement or renewal of the insurance or in the submission of claims thereunder;
 (2) Loss of driving privileges through suspension, revocation, or expiration of the driver's or commercial driver's license of the named insured or any member of his family covered as a driver; provided that the insurer shall continue the policy in effect but exclude by endorsement all coverage as to the person whose driver's license has been suspended or revoked or has expired, if he is other than the named insured or the principal operator;
 (3) Nonpayment of premium, which means failure of the named insured to discharge when due any of his obligations in connection with the payment of premiums on a policy, or any installment of such premiums, whether the premium is payable directly to the insurer or its agent or indirectly under any premium finance plan or extension of credit;
 (4) The place of residence of the insured or the state of registration or license of the insured automobile is changed to a state or country in which the insurer is not authorized to write automobile coverage.
Emphasis added.
The statute thus conditions an insurer's ability to cancel on fulfillment of all three requirements listed in the statute: 1) compliance with the policy provisions; 2) compliance with the provisions in R.C. 3937.30 to 3937.39 (which cover such things as guaranteed renewal with the same coverages, required contents of cancellation notices, and cancellation procedures); and 3) cancellation for a reason listed in the statute, like nonpayment of premium, misrepresentation of the insured, etc. The argument could be made, based solely on the statute (and in particular the italicized portion) that the insurer is required to offer the policy with the same coverages that were offered during the preceding renewal period. If the insurer refuses to offer the same coverages, he will be considered to have attempted to cancel the policy. However, the ability to cancel is strictly limited, and a failure to comply with cancellation requirements means that the cancellation is ineffective. See, R.C. 3937.33. In other words, because of the requirement that the same coverages must be offered, the insurer cannot unilaterally change the policy. This argument about the potential effect of the statute is buttressed by the fact that R.C. 3937.31(B) goes on to say that:
Sections 3937.30 to 3937.39 of the Revised Code do not prohibit:
. (1) Changes in coverage or policy limits, cancellation, or nonrenewal for any reason at the request or with the consent of the insured.
By obvious implication, changes in coverage cannot be made during the mandatory renewal period without the consent of the insured.
When the Ohio Supreme Court discussed R.C. 3937.31 in Benson, it did not specifically mention the part of the statute that we have italicized. Instead, the court cited only the beginning part of R.C. 3937.31(A), i.e, the statement that auto policies shall be issued for a policy period of not less than two years or guaranteed renewable for successive policy periods totaling not less than two years. The court then simply stated that "such policies, when written for specific periods, may be considered term policies rather than continuing policies."19 Ohio St.3d at 44. However, this seems to conflict with the statute and the court never really said why it considered the policies to be term policies, except by referring to the policy provisions. If the statute requires renewal with at least the coverages afforded during the preceding policy period, the statute would seem to be controlling.
Townsend v. State Farm Mut. Auto. Ins. Co. (Aug. 14, 1998), Sandusky App. No. S-97-059, unreported, considered a situation similar to the one at issue in the present case. In Townsend, the insured was entitled at the time of the original contract to make an underinsured motorist claim for the death of her granddaughter under R.C. 3937.18 and the case law interpreting that statute. This was so even though the granddaughter was a non-resident relative and was not within the definition of an "insured" under the policy. Subsequently, S.B. 20 amended the statute and allowed insurers to restrict coverage to bodily injury sustained by insureds. As a result, State Farm sent the grandmother an endorsement restricting UM/UIM coverage to insureds who sustained bodily injury. After State Farm denied the grandmother's consortium claim, the grandmother brought suit against State Farm, contending that the endorsement was ineffective because R.C.3937.31 and the policy language obligated the insurer to keep a constant level of coverage for the two-year guaranteed renewal period.
Based on the policy provisions, which seemed to indicate a continuing contract for the two-year period, the court held that the coverage contemplated by the parties at the time of the original contract could not be reduced without constituting a cancellation of the policy. The court distinguished Benson in a footnote, based on differences in contractual terms. However, the court also went on to consider R.C. 3937.31, and made the following comments:
 In this case, the terms of appellant's original policy for uninsured/underinsured motorist coverage conformed to the requirements of R.C. 3937.18(A), as it existed at the time the policy was issued. That statute, as interpreted by the Ohio Supreme Court in Sexton, supra, provided that appellant was entitled to make a claim for damages due to the death of her non-resident granddaughter, which was caused by the negligence of a uninsured motorist. Pursuant to R.C. 3937.31, State Farm was required to renew the policy for "successive policy periods totaling not less than two years," with "at least the coverages, included insureds, and policy limits provided at the end of the next preceding policy period." Similarly, the policy provided that it would be renewed with the same levels of coverage during the guarantee period.
 Subsequently, pursuant to endorsement 6090MM, appellant became ineligible to assert a claim for uninsured/underinsured motorist benefits due to the death of her granddaughter, which occurred during the two-year guarantee period. The effect of endorsement 6090MM was to alter the parties' contract, creating an implied "cancellation" of appellant's policy. State Farm admittedly did not comply with the dictates of R.C. 3937.31 by sending appellant notice of any impending "cancellation" within the two-year period. Appellant's lack of protest to such a "cancellation" is irrelevant in this case, since State Farm's reduction of her coverage was in violation of the statute and, further, did not result from the occurrence of the any of the events listed in R.C. 3937.31(A). Finally, the record in this case contains no other evidence that appellant consented to a reduction in coverage, beyond the fact that she timely renewed the policy in order to avoid complete cancellation of her automobile insurance for non-payment of premiums.
Id. at p. 5. Compare, Spence v. Westfield Nat. Ins. Co. (Sept. 2, 1998), Monroe App. No. 797, unreported (holding that policy declarations identifying renewal by the same policy number as the original imply that the policy was a continuing policy of insurance subject to annual renewals and was not a new insurance contract. As a result, the original contract, entered into before S.B. 2 applied); and Arnold v. Ratcliff (Oct. 26, 1998), Ross App. No. 98CA2408, unreported (quoting Benson for the proposition that policy language, not the statute, controls how long policy terms are effective and whether a subsequent renewal affects the policy terms).
As we said above, the correct policy provisions have not been provided. Assuming, for the sake of argument, that the provisions before us are similar to the original policies, we note that several policies contain the following language:
8. Termination or Reduction of Coverage
a. Cancellation or reduction of coverage:
 1) You may cancel this policy by advising us in writing when at a future date the cancellation is to be effective.
 2) When this policy is in effect 90 days or more and is not a renewal, we may cancel for any reason, provided we mail you notice within this period. If we cancel, we will mail you at least 10 days notice.
 3) When this policy is in effect 90 days or more or is a renewal, we may only cancel for one or more of the following reasons.
 (a) Nonpayment of premium. If we cancel for this reason, we will mail you at least 10 days notice.
 (b) Your driver's license or that of any family member has been suspended or revoked. If we cancel for this reason, we will mail you at least 30 days notice. However, we may not cancel the policy if only the driver's license of a person other than you has been suspended or revoked. Instead, we may exclude coverage for that person while operating the covered auto.
 (c) We replace this policy with another one providing similar coverages and the same limits for the covered auto. The replacement policy will take effect when this policy is cancelled.
* * *
(c) Automatic termination
 This policy is written for a 6 month period. Subject to the terms of provision a(3) above, it is guaranteed renewable for successive policy periods totaling no less than 2 years. It will automatically terminate at the end of any one policy period for which you or your representative do not accept our offer to renew it. Your failure to pay the required renewal premium means that you have declined our offer.
* * *
(d) Other Provisions
 1) If different requirements for cancellation and nonrenewal or termination of policies become applicable because of the laws of Ohio, we will comply with those requirements.
Policy 25 13814 69 22 (Emphasis added). In our opinion, the above provisions may be read, like the policy in Townsend, to require that the policy must be renewed with the same levels of coverage during the guarantee period. Accordingly, Benson could be distinguished on that basis alone. Again, however, we do not have the pertinent policies before us, with the exception of the motorcycle policy, which was not originally issued until after the effective date of S.B. 20. With regard to that policy only, the amendments to R.C. 3937.18 clearly apply.
Based on the preceding discussion, the first assignment of error is sustained and this case is remanded for consideration of the contents of the original policies of insurance and declaration pages issued in February, 1994.
 II
The second argument raised by the Wodriches is that the anti-stacking provisions in their policies are ambiguous because they depend on law that was unknown at the time of contracting. For purposes of addressing this argument, we will first focus on the language in the motorcycle policy, which was issued two days before the accident. Under Part II, Uninsured Motorist, Limits of Liability, the policy states that:
 The limits of liability shown in the Declarations apply subject to the following:
 1. The limit for "each person" is the maximum for bodily injury sustained by any person in any one accident.
 2. Subject to the limit for "each person," the limit for "each accident" is the maximum for bodily injury sustained by two or more persons in any one accident.
 3. Subject to the laws of the state of the occurrence, we will pay no more than these maximums, regardless of the number of vehicles insured, insured persons, claims, claimants, policies, or vehicles involved in the accident.
Because some states allow stacking and others do not, the Wodriches argue they could not have known, as lay persons, what coverage they were actually purchasing. Additionally, the Wodriches claim the trial court did not address this issue. In response, Farmers says that Mr. Wodrich admitted he had read the policies, but did not ask the agent any questions, even though he had a chance to do so. Farmers also claims the provision is not ambiguous. The trial court did not specifically address the argument that the reference to "the law of the state of the occurrence" created ambiguity. However, because the trial court found the entire provision unambiguous, we must conclude that the court rejected this argument.
As support for their claim that the clause is ambiguous, the Wodriches have cited Grange Mut. Cas. Co. v. Fodor (1984),21 Ohio App.3d 258. In Fodor, the Court of Appeals for Cuyahoga County rejected a limitations clause barring actions against the company that were not commenced "`within the time period allowed by the applicable statute of limitations for bodily injury or death actions in the state where the accident occurred.'" Id. at 262. In finding the limitations clause unenforceable, the court observed that "[n]o reasonably educated non-lawyer could be expected to understand the above-quoted language. Only by retaining the services of an attorney to research the matter could an insured discover what his rights and duties are." Id.
While we do not disagree with the comments in Fodor, that case involves a different situation than the present. In Fodor, no specific time for filing was stated and a layman would have had to seek legal advice to find out when the time would expire. By contrast, the limits of liability section in the Farmers' policy clearly sets out the per person and per accident limits, and then follows with the proviso that Farmers will pay no more than these maximums, regardless of the number of vehicles insured, insured persons, claims, policies, and so on. Viewed in context, the statement that the maximum payment is "subject to the law of the state of the occurrence," is simply a recognition, as in other parts of the policy, that Farmers' obligation may be affected by matters outside the contract. For example, in the liability section, the policy says that if an accident occurs outside the state, the policy will be interpreted to provide any broader coverage required by those laws. Given the state of flux in the law regarding motor vehicle insurance, including such provisions is reasonable and does not create ambiguity. Therefore, in this regard, the trial court's summary judgment was correct, insofar as the motorcycle policy is concerned. However, as with the guaranteed renewal claim, we can make no finding about the remaining five policies that were issued, since the original policies are not before us. The language in the original policies may be the same as what we have already discussed, and if so, summary judgment on the issue of ambiguity would be proper. Additionally, if the policies are found to be "new policies," and guaranteed renewal does not prevent a change in coverage, then the contents of the policies in effect on September 24, 1995, would control. In this latter context, we note that the other policies present in the record have "Limits of Liability" language similar to the motorcycle policy, except that these policies add a statement in paragraph one (the per person limits) that "[a]ny claim for loss of consortium or injury to the relationship arising from this injury shall be included in this limit."
Based on the preceding discussion, the Wodriches' second argument is overruled in part, is sustained in part, and is remanded for further consideration of the original policies issued by Farmers.
 III
The third argument raised by the Wodriches is that the anti-stacking language was not clear, conspicuous, and unambiguous because it was not labeled as anti-stacking language, was not set off from the rest of the policy, was not in bold print, and used technical language not familiar to the average person. In this regard, the motorcycle policy contained the following language, in addition to the anti-stacking provisions already discussed:
Other Insurance
 1. The amount of Uninsured Motorists Coverage we will pay under Additional Definitions 3b [underinsured motorist coverage] shall be reduced by the amount of any other bodily injury coverage available to any party held to be liable for the accident.
 2. Except as provided in paragraph 1 above, if any other Automobile Liability insurance applies to a loss covered by this part, we will pay only our share. Our share is the proportion that our limits of liability bear to the total of all applicable limits.
 3. Any insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance.
 4. If any applicable insurance other than this policy is issued to you by us or any other member company of the Farmers Insurance Group of Companies, the total amount payable among all such policies shall not exceed the limits provided by the single policy with the highest limits of liability.
In assessing these provisions, we start with the concept that insureds are charged with knowledge of the contents of their insurance contracts. Nickschinski v. Sentry Ins. Co., (1993),88 Ohio App.3d 185, 195. Furthermore, the Ohio Supreme Court has considered similar anti-stacking language and has found it unambiguous. See, Hower v. Motorists Mut. Ins. Co. (1992),65 Ohio St.3d 442, 447, overruled on other grounds in Savoie, (1993),67 Ohio St.3d 500. See also, Newland v. Erie Ins. Co. (Feb. 18, 1993), Montgomery App. No. 13548, unreported, remanded 68 Ohio St.3d 98
(remanded to trial court for consideration of whether anti-stacking clause was "intrafamily" [allowed under Savoie] or "interfamily" [not allowed under Savoie]).
In Savoie, the insurer used anti-stacking language similar to the provisions in Hower and those in the Farmers' motorcycle policy. The Ohio Supreme Court agreed that the language passed the "`unambiguous,' `clear' and `conspicuous' test as delineated in Dues v. Hodge (1988), 36 Ohio St.3d 46, paragraph one of the syllabus." 67 Ohio St.3d at 505. However, the court rejected the anti-stacking clauses (and overruled Hower), because of discomfort over the fact that "liability insurers are collecting multiple premiums for multiple policies, while limiting recovery by antistacking language — the import of which is not known or understood by the insured consumer until tragedy strikes." Id.
Based on Savoie's explicit recognition that anti-stacking clauses such as those used in the present case are unambiguous, clear, and conspicuous, we could hardly conclude otherwise. Accordingly, we agree with the trial court that the anti-stacking language in the motorcycle policy is unambiguous. Again, the provisions in the five policies issued originally in 1994 are not before us. We do note, again, that the anti-stacking clauses in the policies in the record are either identical to the motorcycle policy, or similar in all pertinent respects.
In view of the preceding discussion, the third issue is rejected with regard to the motorcycle policy, but is remanded for further consideration of the five policies of automobile insurance issued by Farmers in February, 1994.
 IV
In their fourth argument, the Wodriches contend that stacking should be allowed when a single agency sells multiple policies with UM/UIM coverage from different companies and separate premiums are collected. As support for this argument, the Wodriches cite Lovejoy v. Westfield Nat. Ins. Co. (1996),116 Ohio App.3d 470 . In Lovejoy, the Court of Appeals for Belmont County found anti-stacking clauses ineffective where the insured had paid separate premiums for separate policies with two different companies. The policies in question were a Westfield National policy covering the insured's family automobiles and a Westfield Insurance Company policy covering a business vehicle. Westfield Insurance and Westfield National were owned by the same company, but were separate corporations with different National Association of Insurance Commissioners and federal identification numbers. On the first policy, a premium of $26 was charged for UM coverage. However, on the second policy, issued about six months later, a premium of $55 was charged for UM coverage. Both policies had the same limits, i.e., $200,000 per accident.
After reviewing these facts and the policy provisions, the court held that the separate UM provisions could not be construed as "similar" provisions and that claims could be made under both policies without the invoking the anti-stacking provisions. In particular, the court commented that:
 If, as appellants [the insurers] contend, the policies are sufficiently similar to warrant the limiting of liability to the limits of a single policy, this court must question appellants' rationale for the significant difference in UMC premiums between the two policies. It is worth noting that the higher of the two premiums was the second policy issued. It would be reasonable that if the policies were similar, and if the intent of appellants was to restrict liability coverage, the premium on the second policy would be the lesser of the two. These policies were issued by the same account representative of the same insurance agency. It can only be concluded that the issuing agent was aware of appellees' prior coverage, and issued the UMC provision on the CWP policy for proper business purposes.
 Antistacking language must not only be clear, conspicuous and unambiguous within the confines of an individual policy, but also within the context of a foreseeable interaction with other policies, especially where multiple policies are issued by the same agency. Based on appellants' assertions, there was no logical or rational purpose for appellees to have paid an additional premium for UMC on the CWP policy
Id. at 474-74.
Farmers has distinguished Lovejoy because it involved both a commercial and a family auto policy, not strictly family auto policies, as in the present case. Additionally, Farmers notes that the Wodriches failed to join Mid-Century as a party in the action below. Consequently, Farmers contends that no claim can be made under the Mid-Century policies even if Lovejoy applies. The Wodriches have responded to this argument by pointing out that Farmers claimed below to be the sole proper corporate defendant.
In rejecting the stacking claim, the trial court did not discuss Lovejoy, and also found the issue of multiple premiums irrelevant. Instead, the court relied on the following factors: 1) that R.C. 3937.18 permits even the strictest anti-stacking provisions; 2) that amended R.C. 3937.18 has been upheld by the Ohio Supreme Court; 3) that the contracts were "new policies;" and 4) that the policies themselves contained anti-stacking language. For the reasons mentioned previously, we find this reasoning erroneous, insofar as the trial court failed to consider the effect of the original policy provisions. If the original contracts were in force at the time of the accident, Savoie would apply. As we noted above, Savoie held that insurers may contractually preclude intrafamily stacking, but may not prohibit interfamily stacking. However, even where "intrafamily" stacking is involved, Savoie has been interpreted as requiring a reduction in premiums before an insurer can benefit from the limitation of payment. See, e.g., Cox v. Grange Mut. Cas. Co. (Sept. 12, 1997), Medina App. No. 2646-M, unreported. In Cox, Grange had issued separate policies to two family members but did not reduce the premiums. After reviewing Savoie, the court stated that:
 [a] reduction in premiums is required in order for an insurer to benefit from limiting payment under separately purchased policies among family members of the same household. * * * While we recognize that the Savoie decision is not a model of clarity, we believe it should be interpreted in a way that is meaningful and best appreciates the stated concerns. Indeed, if a reduction in premiums was immaterial to the validity of an intrafamily anti-stacking clause, the distinction between interfamily and intrafamily provisions would be vacuous.
Id. at p. 2.
In the present case, the record does not indicate if Farmers in any way reduced the UIM premiums charged to the Wodriches. Unquestionably, separate premiums were charged, and it appears that the premiums were different in amount. Specifically, the original applications for four of the vehicles show the following charges: 1) 1992 Cadillac DeVille — $24.90 for UM coverage and $7 for UIM coverage; 2) 1990 Chevy Van — $24.90 for UM coverage and $7 for UIM coverage; 3) 1967 Pontiac Tempest — $2.49 for UM coverage and $.70 for UIM coverage; and 4) 1982 Volkswagen Rabbit — $34.70 for UM coverage and $8.30 for UIM coverage. The record does not indicate what premiums were charged thereafter, nor what the premiums for the fifth automobile were. The premiums for the motorcycle policy were $10.90 for UM coverage and $9.30 for UIM coverage. No explanation was given why different amounts were charged.
If the trial court decides on remand that the original contracts were in force, the court must also consider if the premiums were appropriately reduced in consideration of the multiple vehicles insured and premiums charged for the same coverage. We do agree with the trial court that the Mid-Century policies were not at issue, due to Mid-Century's absence as a party. However, that problem could be rectified on remand. In this context, we also note that Lovejoy did not specifically interpret Savoie as requiring premiums to be reduced. However,Lovejoy arrives at the same result by finding that the insurer had no justification for collecting additional premiums when the consumer received no benefit.
As we previously stressed, Savoie unquestionably does not apply to the motorcycle policy and may not apply to the five remaining policies. Contrary to Savoie, the legislature has now explicitly said that both intrafamily and interfamily stacking can be precluded, regardless of the number of premiums paid by an insured. Specifically, the statute now says that:
 [a]ny automobile liability or motor vehicle liability policy of insurance that includes coverages offered under division (A) of this section or selected in accordance with division (C) of this section may, without regard to any premiums involved, include terms and conditions that preclude any and all stacking of such coverages, including but not limited to:
 (1) Interfamily stacking, which is the aggregating of the limits of such coverages by the same person or two or more persons, whether family members or not, who are not members of the same household;
 (2) Intrafamily stacking, which is the aggregating of the limits of such coverages purchased by the same person or two or more family members of the same household.
R.C. 3937.18 (G). Whether one sees the logic in this statute or not, its effect is clear. In this regard, we note that the trial court also incorrectly relied on the proposition that amended R.C.3937.18 was found constitutional by the Ohio Supreme Court inBeagle v. Walden (1997), 78 Ohio St.3d 59. In Beagle, the Ohio Supreme Court responded to a certified question about the constitutionality of S.B. 20. Four grounds of unconstitutionality were considered, but only one issue garnered a majority vote. While four members of the court (Moyer, Cook, Lundberg Stratton, and Pfeifer) agreed that the amendment did not violate the one-subject rule, Justice Pfeifer specifically noted that he expressed no opinion on the other parts of the answer to the certified question. Id. at 65. Justices Douglas and Sweeney dissented without comment, and Justice Resnick dissented, stating that she found the statute unconstitutional. Therefore, the only constitutional issue on which the legislation has passed muster is its method of enactment. We also note that the Ohio Supreme Court has allowed a discretionary appeal in a case which rejected arguments as to the constitutionality of S.B. 20. See, Waite v.Progressive Ins. Co. (June 6, 1998), Huron App. No. H-97-036, unreported, discretionary appeal allowed, 83 Ohio St.3d 1463. (Moyer and Lundberg Stratton dissenting). In Waite, the court of appeals also commented that Beagle's value was problematic. Since the justices who disagreed with allowing the appeal in Waite are two of the three who said in Beagle that S.B. 20 was constitutional, the Supreme Court could be preparing to hold the statute unconstitutional. On the other hand, the court may simply intend to clarify the holding in Beagle.
In any event, even if R.C. 3937.18 as amended applies on remand, the issue of constitutionality has not been definitively resolved. Consistent with the discussion above, the fourth argument in support of the first assignment of error is rejected in part, is sustained in part, and is remanded for further consideration.
 V
The Wodriches' fifth argument is based on their homeowners policy, which had liability limits of $500,000. In this regard, the Wodriches claim the policy also qualifies as vehicle insurance, for which they did not reject UM/UIM coverage. Consequently, they contend they are entitled to $500,000 UM/UIM benefits under that policy as a matter of law. In support of their position, the Wodriches cite Goettenmoeller v. Meridian Mut.Ins. Co. (June 26, 1996), Franklin App. No. 95APE11-1553, unreported, which imputed UM/UIM coverage to a farm-owner's policy providing coverage for the insured's dwelling building, barns, and equipment. After reviewing the policy, the court noted that the policy covered bodily injury caused by recreational vehicles used on the insured premises. Based on the fact that recreational vehicles were included within the definition of motor vehicle in R.C. 4501.01(B), the court found that the policy provided coverage in limited circumstances for the use of a motor vehicle. Further, due to the remedial purpose of R.C. 3937.18 and the strict construction given to insurance policies, the court decided that the policy was a "motor vehicle liability policy" for purposes of R.C. 3937.18, meaning that UM/UIM coverage existed by operation of law. Finally, the court found the UM/UIM coverage was not subject to any exclusions or restrictions in the policy. The basis for this conclusion was that the parties could not have negotiated for any exclusions since the parties never intended UIM coverage to be provided by the policy.
Farmers, like the trial court, distinguishes Goettenmoeller
as a "fact-sensitive" case. According to Farmers, the homeowners' policy involved in the present case differs from theGoettenmoeller policy because the use of all motor vehicles is excluded. However, this is not correct.
The homeowners' policy issued by Farmers provides under "personal liability" coverage that:
 We will pay those damages which an insured becomes legally obligated to pay because of bodily injury, property damage or personal injury resulting from an occurrence to which this coverage applies.
Bodily injury is defined in the policy as "bodily harm, sickness or disease, including care, loss of services, and death resulting from that injury." An occurrence is defined as "an accident involving exposure to conditions which results during the policy period in bodily injury or property damage." Further, according to the policy, the personal liability coverage applies to persons off the insured location if the bodily injury results from the activities of an insured.
The policy states that it does not cover bodily injury to residents of the insured premises, except residence employees who are not covered by Workers' Compensation or Employers' Liability Coverage. Additionally, the policy excludes coverage for:
 "bodily injury, property damage, or personal injury which: * * * results from the ownership, maintenance, use, loading or unloading of * * * motor vehicles." However, this exclusion is specifically made inapplicable to bodily injury to residence employees while in the course of employment by an insured.
Under the policy, a motor vehicle is defined as:
 (11) a. a motorized land vehicle, including a trailer, semi-trailer or motorized bicycle, designed for travel on public roads.
 b. any vehicle while being towed or carried on a vehicle described in 11 a.
 c. any other motorized land vehicle designed for recreational use off public roads.
The policy also states that:
None of the following is a motor vehicle:
 a. A motorized golf cart while on the golf course and used for golfing purposes.
 b. A motorized land vehicle not subject to motor vehicle registration, used only on an insured location.
 c. any watercraft or camp home or utility trailer not being towed or carried on a vehicle described in 11a.
While the above provisions are somewhat less than "easy to read," the policy provides the following pertinent liability coverage: 1) an insured's liability for bodily injury to others, except residents of the insured premises other than certain residence employees, caused by a motorized land vehicle which is not subject to motor vehicle registration and which is used only on an insured location; and 2) If the activities of an insured in owning, maintaining, using, unloading, or loading a motor vehicle cause bodily injury or property damage to a residence employee, liability coverage is provided, if 1) the residence employee is in the course of employment; and 2) the employee is not covered by Workers' Compensation or Employers' Liability Coverage.
The issue is whether these coverages cause the policy to be a "motor vehicle liability policy" subject to the requirements for uninsured and underinsured motorists' coverage. In this context, the version of R.C. 3937.18 in effect at the time of the Wodriches' accident stated that:
 No automobile liability or motor vehicle liability policy of insurance insuring against loss resulting from bodily injury imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless [both UM and UIM coverages are provided].
The statute did not define either "motor vehicle" or "motor vehicle liability policy." However, the Ohio Supreme Court has used the statutory definition of "motor vehicles" in R.C. 4501.01
to decide if contractual restrictions violate the uninsured motorist statute. See, Metropolitan Property Liability Ins.Co. v. Kott (1980), 62 Ohio St.2d 114, and Horsely v. United OhioIns. Co. (1991), 58 Ohio St.3d 44. In this regard, R.C. 4501.01
(B) states in pertinent part that:
 "Motor vehicle" means any vehicle, including manufactured homes and recreational vehicles, that is propelled or drawn by power other than muscular power or power collected from overhead electric trolley wires.
R.C. 4501.01 goes on to list a number of exceptions to the definition that are not pertinent to the Farmers' policy, like motorized bicycles, power cranes, ditch-digging machinery, etc.
Although motorized land vehicles are not classified as motor vehicles under the Farmers' policy, this conflicts with the statute, which includes within the definition of "motor vehicle" any vehicle that is propelled or drawn by power. More important, however, the policy extends liability coverage to its insureds for bodily injury to residence employees caused by the use of a motor vehicle. In two similar situations, we have extended UM/UIM coverage by operation of law. First, in Speelman v. MotoristsMut. Ins. Co. (Dec. 22, 1995), Montgomery App. No. 15362, unreported, we considered a business auto policy which covered vicarious or imputed liability due to negligent use of a hired or nonowned auto. The injured party, Paul Speelman, owned a sole proprietorship and the named insured on the policy was Paul Speelman, dba Overlander Company. At the time of the accident, Speelman was driving a truck titled in his name. Speelman was also an insured under the policy. Based on the fact that the policy provided liability coverage to Speelman, we found that UM/UIM coverage was extended by operation of law. It is not clear from the opinion if the use of the truck could have been excluded from liability coverage as an "owned auto" in light of the fact that Speelman operated a sole proprietorship or was an insured.
Subsequently, in Selander v. Erie Ins. Group (Dec. 31, 1997), Darke App. No. 97CA1432, unreported, we considered a general liability policy issued by Erie to Glenn Selander and Eugene Selander dba Twin Electric. At the time of the accident, Eugene was driving a truck titled to Twin Electric and Glenn Selander. As in Speelman, the policy provided coverage for hired and non-owned autos. Consequently, we held that UIM coverage was provided by operation of law in an amount equal to the policy's liability coverage. Id. at p. 7. Significantly, for purposes of the present case, we rejected several of the insurer's arguments, including the fact that the policy expressly excluded automobile coverage, and that a fair reading of the policy indicated that the parties never intended UIM coverage to be provided. Id.
Furthermore, we also rejected Erie's argument that UIM coverage should be excluded because the use of the truck would not have qualified for liability coverage in an at-fault accident. Specifically, under the policy, coverage only extended to damages an insured became legally obligated to pay because of the use of a non-owned auto in the business by someone other than a named insured. Because Eugene Selander was a named insured, the policy would not have provided liability coverage for the accident. Concerning this lack of liability coverage, we stated as follows:
 Notwithstanding this conclusion, the appellees remain entitled to underinsured motorist coverage provided by operation of law. The present case does not involve an accident stemming from Eugene Selander's negligence. Rather, the accident resulted from the negligence of David Clark, an underinsured motorist who struck the Selanders' truck. The Selanders were insureds under a Fivestar automobile liability policy providing coverage for non-owned automobiles. Under these circumstances, we cannot infer the non-existence of underinsured motorist coverage extended by operation of law simply because the policy's language would have precluded liability coverage at the time of the accident. In Demetry v. Kim (1991), 72 Ohio App.3d 692, 595 N.E.2d 997, the Franklin County Court of Appeals rejected an argument that to invoke "implied underinsured coverage appellant's decedent must first fit within the liability coverage afforded by the policy." The court reasoned that "there is nothing, absent clear language evidencing an intent to do so, to prevent uninsured/underinsured coverage from being broader than liability coverage." Id. at 698, 595 N.E.2d 997. See also Erie Ins. Co. v. Kiser
(Sept. 7, 1994), Ashland App. No. CA 1070, unreported (noting that "[u]nderinsured motorist coverage is a claim different in nature from a liability claim for coverage" and concluding that "although the defendants are precluded from making a claim under the liability portion of the policy, they are not precluded from making a claim under the UM/UIM portion of the policy").
Id. At p. 8.
Based on the reasoning in Selander, underinsured motorists coverage would apply to the Farmers' homeowners policy by operation of law. As we noted above, motor vehicle liability coverage was provided to the insured for bodily injury or property damage caused to residence employees. Therefore, because automobile liability coverage was extended to the Wodriches, the policy was a "motor vehicle liability policy" under R.C. 3937.18. Moreover, even though coverage would not have been provided to Wodrich if he were at fault in the accident, that is irrelevant.
Two other points are important. First, the Ohio Supreme Court has accepted a discretionary appeal in Selander, and has also certified that a conflict exists between Selander and Maulerv. Westfield Ins. Co. (Sept. 28, 1989), Franklin App. Nos. 88AP-914 and 88AP-915, unreported. See, Selander v. Erie Ins.Group (1998), 81 Ohio St.3d 1514 and 81 Ohio St.3d 1515. The question certified is:
 "Do the provisions of R.C. 3937.18 apply to a policy of primary insurance which provides coverage for claims of liability arising out of the use of hired or non-owned automobiles, but is not issued for delivery with respect to some particular motor vehicle?"
In Mauler, the court held that R.C. 3937.18 was inapplicable because the policy of insurance was not issued for delivery with respect to any motor vehicle registered or principally registered or principally garaged in Ohio. As in Selander, the policy covered nonowned or hired automobiles. The court's discussion was brief, and was based on the court's belief that the policy was not issued for delivery because the named insured (a church) did not own or garage any motor vehicles. Id. at p. 2. However, this analysis ignores a point we made in Selander, i.e., that:
 Ohio's uninsured/underinsured motorist statute is premised on the tortfeasor's legal liability to the injured insured. "Thus, the intent of the statute is to provide uninsured and underinsured motorist coverage for injured persons who have a legal cause of action against a tortfeasor but who are uncompensated because the tortfeasor is either (1) not covered by liability insurance or (2) covered in an amount that is less than the insured's uninsured motorist coverage."
Selander, at p. 6 (citations omitted). Additionally, unlike the insured in Mauler, the Wodriches did own and garage motor vehicles.
The second point we wish to emphasize is that at the time of the Wodriches' accident, R.C. 3937.18 did not contain a definition of "motor vehicle liability policy." However, effective September 3, 1997, the legislature amended the statute to include a definition. In its current version, the statute says that:
 (L) As used in this section, "automobile liability or motor vehicle liability policy of insurance" means either of the following:
 (1) Any policy of insurance that serves as proof of financial responsibility, as proof of financial responsibility is defined by division (K) of section 4509.01 of the Revised Code, for owners or operators of the motor vehicles specifically identified in the policy of insurance;
(2) Any umbrella liability policy of insurance.
The amendment was brought to our attention in Selander, but we rejected its applicability because the version in effect on the date of the accident did not contain a definition of motor vehicle liability policy. Selander, at p. 9. For the same reason, we reject its applicability here, since the Wodriches' accident took place on September 24, 1995.
In granting summary judgment in favor of Farmers, the trial court did not consider our decisions in Selander or Speelman, nor did the court consider the effect of the underinsured motorist statute and case law interpreting the statute as set forth inSelander. Instead, the court focused solely on the fact that liability coverage was excluded under the policy for the accident in question. As we pointed out above, such an approach is erroneous. The record before us indicates as undisputed fact the matters set forth above, as well as the fact that the Wodriches were not offered UM/UIM coverage in regard to the homeowners policy. Accordingly, the trial court erred in granting summary judgment to Farmers on this point. To the contrary, based on the undisputed facts, the trial court should have found UM/UIM coverage in an amount equal to the liability limits, i.e., $500,000.
Based on the preceding discussion, the fifth argument has merit and the assignment of error is sustained on this point.
 VI
In their sixth and final argument, the Wodriches contend that genuine issues of material fact exist on their negligence and bad faith claims. Concerning negligence, the Wodriches say ample evidence was presented about the departure of Farmers' agent (Stethem) from standards of custom and practice in the insurance industry. In particular, the Wodriches point to Stethem's failure to adequately explain coverages; the fact that he did not offer an umbrella policy; and Stethem's selection of the motorcycle policy limits after the accident. The trial court did not dwell extensively on the negligence issue, but did say it found no evidence that Stethem acted negligently in his dealings with the Wodriches. In reaching this conclusion, the court rejected what it called the agent's arguable violation of a company sales policy as a basis for a negligence claim.
In Damon's Missouri, Inc. v. Davis (1992), 63 Ohio St.3d 605, the Ohio Supreme Court noted that "[a]n insurance sales agency owes its customer a duty to exercise good faith and reasonable diligence in undertaking to acquire the needed insurance coverage." Id. at 613, n. 2, citing First CatholicSlovak Union v. Buckeye Union Ins. Co. (1986), 27 Ohio App.3d 169. Moreover, "an agency has a duty to exercise reasonable care in advising its customer about the terms of requested coverage."Stuart v. National Indem. Co. (1982), 7 Ohio App.3d 63, 66. If damages result from failure to function in accordance with these duties, the insurance agent or agency is liable for damages.63 Ohio St.3d at 613, n. 2. Finally, when an agent is acting as a soliciting agent for an insurer, the insurer is charged with responsibility for actions that are within the scope of the agent's authority. Id. at 609-10. We have previously held that "[w]hether an agent has negligently failed to procure insurance is ordinarily a question of fact." Minor v. AllstateIns. Co., Inc. (1996), 111 Ohio App.3d 16, 22. The same observation would generally be true of an agent's exercise of care in advising customers about terms of coverage. In the present case, several factual issues existed, with the issue being whether the disputes involved issues of material fact. In this regard, we note that at the time William Wodrich first consulted with Stethem, Wodrich was insured with Cincinnati Insurance. Wodrich had been insured by Cincinnati for two years, with policy limits on his vehicles of $100,000/300,000. He did not have an umbrella policy when he was insured with Cincinnati, nor did he have such a policy with State Farm Insurance, his prior insurer for many years.
Mr. Wodrich and Mr. Stethem met on two occasions to discuss the insurance that was originally purchased in February, 1994. At that time, Wodrich was a Vice-President at Bank One, his wife was also employed, they owned their own home, and they had at least four vehicles. Wodrich's testimony was that he asked Stethem for "proper coverage" and relied on Stethem's recommendations. According to Wodrich, Stethem determined the levels of insurance and the policy, and never recommended that the limits be higher than $100,000/300,000. Wodrich did not recall being given any options about levels of coverage, i.e., prices for different levels of insurance, other than options for different amounts of deductibles. Wodrich also claimed that Stethem did not make any attempt to find out what the Wodriches' income and assets were. And finally, Wodrich said Stethem never offered him an opportunity to purchase umbrella coverage before the accident.
According to the deposition of Farmers' District Manager, an agent has the duty to explain coverages to his customers. Industry practice is to make the customer aware of the various coverages, the limits, and the existence of an umbrella policy, which provides protection over all the insured's personal limits for personal insurance, homeowners, auto, etc. The agent should then make recommendations and let the customer decide on coverage. In this particular case, Stethem consulted with the District Manager because the Wodriches had an antique auto that had to be manually rated. Stethem told the District Manager that he had tried to get financial information on the Wodriches, but that they would not tell him anything. The District Manager told Stethem that he should at least offer an umbrella policy even if the Wodriches did not want to give financial information. This statement was based on the manager's knowledge of the type of home the Wodriches owned and Mr. Wodrich's position as a bank vice-president. During this discussion, Stethem said he had already offered umbrella coverage.
Farmers required minimum underlying limits of $100,000/300,000 for obtaining a one million dollar umbrella policy. UM/UIM coverage with Farmers is offered up to $250,000/500,000, but Farmers does not recommend that option because it increases the premiums on each car. According to the District Manager, most people keep $100,000/300,000 underlying limits and purchase the umbrella on top of that coverage. The cost of umbrella coverage in 1995 would have been about $150 per year and was cheap coverage.
In contrast to Mr. Wodrich's' testimony, Stethem claimed he had recommended $250,000 limits, but that Wodrich selected the $100,000/300,000 limits instead. Additionally, Stethem testified that he asked Wodrich if he wanted an umbrella policy, but Wodrich said he did not even want to consider it. As was reflected in the District Manager's testimony, Stethem testified that Wodrich was private and would not give him financial information. Stethem also said he explained UM/UIM coverage to Wodrich. Specifically, he told Wodrich that UM/UIM coverage was for his protection in the event that he was hit by a driver without insurance or a driver who did not have enough insurance. Stethem's understanding of UM/UIM coverage at that point was that if the at-fault driver had $50,000/100,000 limits, and Wodrich had $100,000/300,000 limits, Wodrich would be able to collect another $50,000 from Farmers. Stethem told this to Wodrich. The issue of stacking coverages apparently did not come up. Even at the time of his deposition, Stethem did not know what anti-stacking language was, and Mr. Wodrich indicated that the two never discussed whether the UIM coverages were cumulative.
After Wodrich received the policies and declarations sheets, he read each policy. He said the policies were confusing and he asked Stethem several questions. Some of the ambiguous language related to the limits of liability and how that section applied if more than one of the Wodriches' vehicles were involved in a single accident. Based on his reading of the policies, Wodrich appears to have believed that because he had multiple policies, his coverage exceeded the limits of a single policy. However, his deposition was unclear as to why he believed that. In any event, Wodrich never asked Stethem about the ambiguous language in the policies.
As we mentioned above, Mr. Wodrich wrote a letter to Stethem two days before the accident, asking Stethem to bind coverage for a Honda Goldwing motorcycle. The letter did not specify the coverage limits, but asked for "proper coverage." In the letter, Wodrich also said he and his wife intended to ride the motorcycle that Sunday (which ended up being the date of the accident). Wodrich testified in his deposition that he assumed the limits on the motorcycle would be the same as those he had on his other vehicles. After the accident, Stethem visited Wodrich in the hospital and learned that Wodrich had sent a letter about coverage for the motorcycle. Stethem saw the damage to Wodriches' leg and also was told that Mrs. Wodrich was unconscious and in intensive care. Subsequently, Stethem received the letter in the mail and faxed it to the regional office to get permission for coverage. Stethem placed the same limits on the motorcycle policy as the other policies already had. After reviewing the above facts, we find that genuine issues of material fact exist concerning the alleged negligence of Farmers' agent. At the outset, we note that Stethem was not an "independent agent" or "insurance broker" as defined in R.C. 3905.47 and Damon's Missouri, Inc.,supra, 63 Ohio St.3d 605, 610-11. Instead of being able to concurrently represent other insurers of his choice and select among those insurers, Stethem's relationship with Farmers was exclusive, in that he was precluded from selling products of other insurers if Farmers provided the product. As a result, Stethem was an "insurance agent," acting solely on behalf of the identified insurer, i.e., Farmers, and Farmers is responsible for acts of omissions within the scope of Stethem's authority. Id. at 610.
Regarding the claim that Stethem failed to adequately explain coverages, we agree in part with the trial court about the absence of factual issues. In this regard, Stethem explained the purpose of UIM coverage, and, in effect, alerted Wodrich that his coverage was not excess coverage. As it turns out, Stethem's explanation was incorrect, because Savoie had been previously decided on March 17, 1993, and was not superseded until October 20, 1994. Thus, the UIM coverage that was originally purchased was, in fact, excess coverage. However, this mistake did not proximately cause Wodriches' damages. Logically, being told that coverage is excess would not motivate an insured to buy more insurance; if anything, the insured would be motivated to purchase less coverage.
Concerning the multiple policies and stacking, Stethem did not discuss these issues. However, Wodrich did read his policies. Although the agent has certain duties, consumers are also charged with knowledge of their own insurance policies. In this case, Wodrich noted certain ambiguities and was confused, but did not follow up. As has been noted in a number of cases, "[a]n agent or broker is not liable when a customer's loss is due to the customer's own act or omission." Craggett v. Adell Ins. Agency
(1993), 92 Ohio App.3d 443, 453. At present, though, we can only agree in part with the trial court because the correct policies were not in the record. As we mentioned above, the limits of liability clause and "other insurance" clause in the motorcycle policy were unambiguous. Upon reading those clauses, Wodrich should have realized that coverage was restricted to the limits in a single policy, regardless of how many claims he had or how many Farmers' policies were involved. Accordingly, if the contents of the original policies were the same as the motorcycle policy, Mr. Wodrich's failure to act on the issue of stacking was not a result of Stethem's negligence, but was caused by Wodrich's' own actions in failing to ask questions about ambiguities. Again, we stress that if the original policies were still effective, Savoie would control. The result in that event is that because of the multiple policies, Farmers would have to show a reduction in premiums before the anti-stacking language would apply. In this context only, the actions of both Stethem and Wodrich would be irrelevant.
We further find genuine issues of material fact in connection with Stethem's alleged failure to offer or to recommend an umbrella policy. If Mr. Wodrich's testimony is believed, Stethem did not recommend an umbrella policy, even though Farmers' own district manager felt an umbrella policy was needed. Furthermore, the failure to recommend such a policy violates industry practices. Certainly, one could believe Stethem's testimony that he did recommend an umbrella policy. However, resolving credibility issues is not appropriate in summary judgment situations. Snell v. Salem Ave. Assoc. (1996), 111 Ohio App.3d 23,38. We also note that even if Stethem's own testimony is believed, his recommendation of a $250,000 policy contradicts the practice at Farmers and could create an inequitable situation in which an insured receives a recommendation for coverage that provides less protection than an umbrella policy, but requires payment of greater premiums. As we mentioned earlier, the charge for an umbrella policy would only have been $150 per year. The premium quotations attached to Stethem's deposition are virtually illegible, due to poor copy quality, and the deposition testimony does not indicate what the difference would have been between the cost of an umbrella policy and the premiums on the $250,000 policies Stethem says he recommended. Furthermore, the record does not reveal whether Stethem told the Wodriches the cost of an umbrella policy or explained the amount of additional coverage that would purchase. Accordingly, we find summary judgment was improperly granted in connection with issues relating to the umbrella policy and with respect to the coverage limits that Stethem says he recommended.
Finally, we see no issues of fact in connection with Stethem's selection of limits for the motorcycle policy. In the first place, Mr. Wodrich's letter was merely an offer to purchase insurance that was not received, let alone accepted, before the accident. Technically, Farmers was not obligated to even issue a policy, but appears to have done so based on the fact that the Wodriches had other policies of insurance with the company. Furthermore, even Mr. Wodrich expected the policy limits to be the same as his other policies. Under the circumstances, we see no negligence on Stethem's part in this particular context.
Due to the existence of genuine issues of material fact on the issue of Stethem's negligence, the sixth argument in support of the assignment of error is well-taken, to the extent noted above.
The second issue raised in this regard relates to the bad faith claims against Farmers. In this context, the trial court did not refer to specific facts when rejecting the claims. Instead, the court generally said that it found nothing in the record to indicate that Farmers violated the bad faith standard set out inZoppo v. Homestead Ins. Co, (1994), 71 Ohio St.3d 552. In Zoppo, the Ohio Supreme Court held that: "[a]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." Id. at 551-52, syllabus one.
As evidence of bad faith, the Wodriches point to these items: (1) the denial of their UIM claims; and (2) issuance of the motorcycle policy with the same limits as the tortfeasor's liability limits. According to the Wodriches, since Farmers' selling agent knew of the severity of the injuries, use of the same policy limits was an attempt by Farmers to avoid exposure on the UIM claim. The Wodriches also criticize the acts of Farmers' corporate owner, British American Tobacco (BAT), in advancing tort reform without informing Farmers' claims personnel. And finally, the Wodriches point to the "disconnect" between claims and sales personnel, i.e., the claims personnel knew S.B. 20 would reduce exposure, while sales personnel were trained that S.B. 20 would expand customers' rights.
According to the evidence before the trial court, Farmers denied the Wodriches' UIM claims on November 26, 1996, based on Farmers' belief that S. B. 20 was the controlling law. Farmers believed that under the amended law, no coverage would exist if the tortfeasor's limits equaled the UIM coverage. Farmers' reliance on S.B. 20 was reasonably justified, particularly since a number of courts, including this one, also felt S.B. 20 applied to accidents occurring after the effective date of the act. See, e.g., Ross v. Farmers Ins. Group (Jan 10, 1997), Montgomery App. No. 15865, unreported, reversed (1998), 82 Ohio St.3d 281. We further cannot find that either Farmers or its agent acted in bad faith in setting the policy limits for the motorcycle policy when Farmers was not even legally obligated to issue the policy (or at most, could only arguably be obligated).
Limited evidence was presented in the trial court about the alleged political activities of BAT. At the time of the accident, Farmers Insurance Group (consisting of six Farmers' companies) was owned by BAT, which is a huge conglomerate. BAT also owns several tobacco holding companies and insurance companies in other countries. The sole evidence relied on by the Wodriches is the annual letter of the chief executive officer of BAT, which tells stockholders that "[w]e will continue to work hard for regulatory reform in the United Kingdom and tort reform in the United States because both systems place a heavy burden on business and impose undue extra costs on our consumers." The letter also states that "in the U.S., Farmers has gained regulatory approval for new property insurance products which give reduced exposure to catastrophes."
The Wodriches have not pointed to any campaign or contribution law that has been violated. Instead, they appear to claim that an insurance company acts in bad faith when it advocates unspecified tort reform measures or obtains approval to provide products which reduce the company's exposure to risks. We disagree with these concepts for several reasons. In the first place, the allegations are extremely vague, as the type of "tort reform" being advocated is not specified. Second, an insurance company does not have a fiduciary relationship with its customers, nor does it have a duty to advance the political interests of its customers at the expense of its own economic interests. Like many other corporations, insurance companies enter into contractual relationships and agree to provide certain products for specified fees. While substantially more certainty and predictability exist in the grocery field than the insurance industry, and people do not enter into written agreements to purchase groceries, no one would suggest that a grocer must advocate politically for lower prices for the benefit of customers. Likewise, no one would suggest the grocer has done something improper by urging reform of laws that decrease profit — even if such laws may benefit the consumer. As was noted by the Court of Appeals for Franklin County in United Auto Workers, Local Union 1112 v. Philomena
(1998), 121 Ohio App.3d 760, in a somewhat related context:
 "Some may think that one group or another should not express its view in an election because it is too powerful, because it advocates unpopular ideas, or because it has a record of lawless action. But these are not justifications for withholding First Amendment rights from any group — labor or corporate. * * * First Amendment rights are part of the heritage of all persons and groups in this country. They are not to be dispensed or withheld merely because we or the Congress thinks the person or group is worthy or unworthy."
Id. at 788 (citation omitted). Furthermore, reform may negatively affect certain consumers, but could reduce fees and benefit the vast majority of consumers who do not make claims. Again, these are matters for the political system to resolve, not the courts. Accordingly, we find no bad faith in the fact that Farmers' parent company advocated tort reform.
And finally, for purposes of the present case, it matters not that Farmers' claims personnel knew S. B. 20 would restrict coverage, while sales people may have thought it expanded coverage. In this context, Farmers' District Manager, who trained sales personnel, incorrectly testified that S.B. 20 allowed stacking and enhanced the ability of an insured to make a claim under UM/UIM coverage. However, this perception was never communicated to the Wodriches. In fact, the Wodriches never discussed stacking with anyone from Farmers. While one might conclude that Farmers could better train its sales personnel, the mistaken impression of the District Manager had nothing to do with the damages, if any, sustained by the Wodriches in this case.
Based on the preceding analysis, we find the trial court correctly granted summary judgment on the bad faith claims. The remainder of the sixth argument is sustained, however, with the exceptions noted above.
In light of the foregoing discussion, the Wodriches' single assignment of error is sustained to the extent set forth above. Accordingly, this matter is reversed and remanded to the trial court for further proceedings consistent with our opinion.
GRADY, P.J. and BROGAN, J., concur.